**John DOE I, et al., Plaintiffs,**

v.

**UNOCAL CORP., et al., Defendants.**

**No. CV 96–6959 RAP (BQRX).**

United States District Court,
C.D. California.

Nov. 18, 1998.

1176

Dan Stormer, Anne Richardson, Randall R. Renick, Hadsell & Stormer, Pasadena, CA, Paul L. Hoffman, Bostwick & Hoffman, Santa Monica, CA, Judith Brown Chomsky, Jennifer Green, Center for Constitutional Rights, New York City, for plaintiffs.

Daniel P. Collins, Munger Tolles & Olson, Los Angeles, CA, Edwin V. Woodsome, Jr., Howrey & Simon, Los Angeles, CA, Kristin Linsley Myles, Munger Tolles & Olson, San Francisco, CA, for Unocal Corp, defendant.

Peter H. Mason, Richard R. Mainland, Larissa A.J. Kehoe, Fulbright & Jaworski, Los Angeles, CA, for Total S.A., defendant.

Daniel P. Collins, Paul J. Watford, Munger Tolles & Olson, Los Angeles, CA, Edwin V. Wodsome, Jr., Howrey & Simon, Los Angeles, CA, for John Imle, defendant.

Edwin V. Woodsome, Jr., Howrey & Simon, Los Angeles, CA, for Roger C. Beach, Moes 1–500, defendants.

## ORDER GRANTING MOTION OF DEFENDANT TOTAL S.A. TO DISMISS FOR LACK OF PERSONAL JURISDICTION

PAEZ, District Judge.

### I.

### *Introduction*

Doe plaintiffs, farmers from the Tenasserim region of Burma, bring this class action against defendants Unocal Corporation ("Unocal"), individuals John Imle and Roger C. Beach, who are, respectively, the President and Chairman/Chief Executive Officer of Unocal, and Total S.A. ("Total"), a French corporation. Plaintiffs allege that the State Law and Order Restoration Council ("SLORC") is a military junta that seized control in Burma (now known also as Myanmar) in 1998, and that the Myanma Oil and Gas Enterprise ("MOGE") is a state-owned company controlled by SLORC that produces and sells energy products. Plaintiffs seek injunctive, declaratory and compensatory relief for alleged international human rights violations perpetrated by defendants in furtherance of defendants Unocal, Total and MOGE's joint venture, the Yadana gas pipeline project.

Plaintiffs contend that defendants are building both offshore drilling stations to extract natural gas from the Andaman Sea and a port and pipeline to transport the gas through the Tenasserim region of Burma and into Thailand. According to plaintiffs' complaint, defendants, through the SLORC military, intelligence and/or police forces, have used and continue to use violence and intimidation to relocate whole villages and force farmers living in the area of the proposed pipeline to work on the pipeline and pipeline-related infrastructure. Plaintiffs allege defendants' conduct has caused plaintiffs to suffer death of family members, assault, rape and other torture, forced labor, and the loss of their homes, in violation of California law, federal law and customary international law. Plaintiffs seek to represent a class numbering in the tens of thousands and consisting of:

> all residents of the Tenasserim region of Burma (bounded on the north by latitudinal line of 15 degrees 15 minutes North; on the south by the latitudinal line of 13 degrees, 30 minutes North; on the west by the coastline and offshore islands; and on the east by the Thai/Burmese border) who have been, are, or will be subject to the following acts in furtherance of the Yadana gas pipeline project in which defendants are joint venturers: forced relocation, forced labor, torture, violence against women, arbitrary arrest and detention, cruel, inhuman or degrading treatment, crimes against humanity, the death of family members, battery, false imprisonment, assault, negligent hiring, or negligent supervision.

Plaintiffs' Response to the February 27, 1998, Order of the Court with Regard to Class Certification at 1. Plaintiffs seek to represent the proposed class and obtain declaratory and injunctive relief on behalf of the class pursuant to Fed.R.Civ.P. 23(b)(2).

In addition, plaintiffs seek damages on their own behalf, based on allegations of (1) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"); (2) forced labor; (3) crimes against humanity;

(4) torture; (5) violence against women; (6) arbitrary arrest and detention; (7) cruel, inhuman, or degrading treatment; (8) wrongful death; (9) battery; (10) false imprisonment; (11) assault; (12) intentional infliction of emotional distress; (13) negligent infliction of emotional distress; (14) negligence per se; (15) conversion; (16) negligent hiring; (17) negligent supervision; (18) violation of California Business & Professions Code § 17200. By their nineteenth claim for relief, plaintiffs seek injunctive and declaratory relief. The Court previously granted the Unocal defendants' motion to strike plaintiffs' Fifteenth claim for conversion.

Pending before the Court is the Motion of Defendant Total S.A. to Dismiss for Lack of Personal Jurisdiction and Insufficiency of Service of Process ("Motion"). At the initial hearing on the Motion on January 12, 1998, the Court granted plaintiffs' request for jurisdictional discovery with respect to general jurisdiction and ordered the parties to meet and confer to create a discovery plan. In the course of jurisdictional discovery, Total provided plaintiffs with over 500 pages of documents and produced five witnesses for deposition: (1) Alain–Marc Irissou (Total's General Counsel); (2) Dominique Mounier (chief in-house legal counsel for Hutchinson, S.A. ("HSA"), a Total subsidiary based in Paris); (3) Herve Oberreiner (Executive Vice–President of Total America, Inc. ("TAI"), a direct U.S. subsidiary of Total); (4) John Powell (the Controller for TAI); and (5) Thomas Popma (Controller of Hutchinson Corporation ("HC"), a Total indirect subsidiary in Grand Rapids, Michigan). Mason Decl., ¶ 9. Following discovery and supplemental briefing, the Court again heard oral argument on the Motion on August 18, 1998.

On August 28, 1998, the Court directed the parties to submit further briefing as to whether

> Total's subsidiary holding companies in California, or Total's subsidiary holding companies in the United States with substantial California contacts, act as Total's agents by selectively acquiring and holding

operating companies in specific niches in which Total has significant market share worldwide.

Minute Order of August 28, 1998. The parties submitted supplemental papers in September, 1998, completing the argument and record before the Court.

Upon consideration of the parties' papers submitted in conjunction with the motion, including all supplemental briefs, declarations and supporting documentation and the oral arguments of counsel, for the reasons explained below, the Motion is **GRANTED**. Although the service of the summons and complaint was not defective, plaintiffs have not shown that this Court has personal jurisdiction over Total.

## II.

### Discussion

#### A. Sufficiency of Service[1]

Total contends that it is not properly before the Court because plaintiffs' service of the summons and complaint was defective. Plaintiffs delivered the original complaint in this action to the Clerk of the Court for service under the Hague Convention on March 31, 1997. On April 4, 1997, plaintiffs filed their First Amended Complaint. Total was personally served with the original complaint on June 3, 1997.

■ Total argues service was not effective because it was ultimately served with a superseded pleading. Plaintiffs take the position that service was "effected" when they delivered the complaint to the Clerk, and was "completed" when Total was finally served. Plaintiffs correctly cite the rule that under the Hague Convention, "[t]he legal sufficiency of a formal delivery of documents" is determined by reference to the "internal law of the forum state." *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 700, 108 S.Ct. 2104, 100 L.Ed.2d 722 (1988). Nonetheless, plaintiffs' argument that service was "effected" when the complaint was delivered to the Clerk is meritless. As Total points out, plaintiffs fail to distinguish be-

---

1. Although the Court previously indicated that it would deny Total's motion to dismiss for insufficiency of process, the Court now sets forth its reasoning in writing.

tween personal service and service by mail. The cases on which plaintiffs rely involved California Code of Civil Procedure §§ 415.40 and 415.20, which explicitly provide that service is effected when mailed, although it is not deemed complete until ten days from mailing. No such provision is found in California Code of Civil Procedure § 415.10, which provides that "[a] summons may be served by personal delivery of a copy of the summons and of the complaint to the person to be served. Service of a summons in this manner is deemed complete at the time of such delivery." In short, service was effected upon delivery of the summons and complaint to Total.

▪ Turning to the next piece of the puzzle, "[i]t is hornbook law that an amended pleading supersedes the original, the latter being treated thereafter as non-existent. [ ] Once amended, the original no longer performs any function as a pleading[.]" *Bullen v. De Bretteville*, 239 F.2d 824, 833 (9th Cir.1956) (internal citations omitted); *see also, Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1546 (9th Cir.1989) (same). An original complaint is only superseded, however, when the amended complaint is properly served, not when it is filed.[2] *International Controls Corp. v. Vesco*, 556 F.2d 665, 669 (2d Cir. 1977) (concluding that judgments based on original complaint were valid despite filing of amended complaint because amended complaint was never properly served).

As the Second Circuit concluded in *Vesco*, to hold that an amended complaint supersedes the original complaint when the amended complaint is filed "would leave a case in a state of suspended animation in the interim between filing and service of the amended complaint, with the court perhaps even lacking personal jurisdiction over the defendant." 556 F.2d at 669 (applying rule where original complaint was served prior to filing of amended complaint). In addition, such a rule would discourage plaintiffs from amending their pleadings when faced with the difficulty of serving certain defendants. *Id.* For these reasons, the Second Circuit concluded that the better rule is to deem the original complaint superseded by an amended pleading only when service of the amended pleading is completed. *Id.*

Total relies on a contrary holding in *Phillips v. Murchison*, 194 F.Supp. 620, 622 (S.D.N.Y.1961), where the court found that serving a superseded complaint was not proper service because "[u]pon the filing of the amended complaint ... that amended complaint superseded the original complaint." *Id.* (applying rule where service of original complaint was only effected after amendment). Unlike the Second Circuit in *Vesco*, however, the district court in *Phillips* did not analyze the timing of supersedure; certainly, the *Phillips* court never discussed any policy rationale for concluding that supersedure occurs at the time of filing rather than when service is complete. We conclude that the better rule, and the one more likely to be adopted by our own Circuit, is the rule established by the Second Circuit in *Vesco*.[3]

▪ Applying that rule here, the original complaint was in effect when Total was personally served. Once plaintiffs served Total with the original complaint, however, that complaint was immediately superseded by the First Amended Complaint. Nonetheless, Total was properly served with the then-operative complaint, and Total's motion to dismiss on the basis of insufficiency of service of process is denied.

---

**2.** The *Vesco* court limited this holding somewhat with the caveat that service is the trigger for supersedure of a prior pleading, "at least where ... the amended complaint is required to be served under Rule 5(a)." *Vesco*, 556 F.2d at 669. However, Fed.R.Civ.P. 5(a) requires that "every pleading subsequent to the original complaint" must be served on all parties unless the court orders otherwise. Accordingly, the rule is applicable in virtually all cases concerning amended complaints.

**3.** Although *Vesco* distinguished *Phillips* based on the order of events, the Court finds that a blanket rule regarding the timing of supersedure is more appropriate than a rule that holds a complaint superseded as of the time of filing in certain cases and superseded as of the time of service in others. *See Vesco*, 556 F.2d at 669 n. 4.

## B. *Rule 12(b)(2) Motion to Dismiss*

█ Fed.R.Civ.P. 12(b)(2) governs dismissal for lack of personal jurisdiction. In order to exercise personal jurisdiction over a nonresident defendant in a case presenting a federal question, the district court must first determine that "a rule or statute potentially confers jurisdiction over the defendant and then conclude that asserting jurisdiction does not offend the principles of Fifth Amendment due process." *Go–Video, Inc. v. Akai Electric Co., Ltd.*, 885 F.2d 1406, 1413 (9th Cir. 1989).

█ It is the plaintiff's burden to establish the court's personal jurisdiction over a defendant. *Cubbage v. Merchent*, 744 F.2d 665, 667 (9th Cir.1984), *cert. denied*, 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 380 (1985). The court may consider evidence presented in affidavits to assist it in its determination and may order discovery on the jurisdictional issues. *Data Disc, Inc. v. Systems Technology Assoc., Inc.*, 557 F.2d 1280, 1285 (9th Cir.1977). However,

> [w]hen a district court acts on a defendant's motion to dismiss without holding an evidentiary hearing, the plaintiff need make only a prima facie showing of jurisdictional facts to withstand the motion to dismiss. [ ] That is, the plaintiff need only demonstrate facts that if true would support jurisdiction over the defendant.

*Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir.1995) (citations omitted); *see also AT & T v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir.1996) (where trial court rules on jurisdictional issue based on affidavits and discovery materials without holding evidentiary hearing, plaintiff need only make prima facie showing). Where not directly controverted, plaintiff's version of the facts is taken as true for the purposes of a 12(b)(2) motion to dismiss. *AT & T*, 94 F.3d at 588. Likewise, "conflicts between the facts contained in the parties' affidavits must be resolved in [plaintiffs'] favor for purposes of deciding whether a prima facie case for personal jurisdiction exists." *Id.* (citations omitted).

Total's motion to dismiss for lack of personal jurisdiction raises interesting questions regarding when a "national contacts" test is available under Fed.R.Civ.P. 4(k)(2); whether a "national contacts" test applies where plaintiffs assert a RICO claim against a foreign national served outside the United States; and whether, with respect to general and specific personal jurisdiction under the forum state's long-arm statute, the alter ego and agency doctrines require the Court to attribute to a foreign national the contacts of its subsidiaries in the United States.

### 1. Rule 4(k)(2)

By virtue of the 1993 Amendments to Fed. R.Civ.P. 4, Rule 4(k)(2) provides that

> [i]f the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

The Advisory Committee notes reiterate that the provision applies only when "a federal claim is made against a defendant not subject to the jurisdiction of any single state."

█ Rule 4(k)(2) provides no basis for jurisdiction based on Total's direct contacts. Total has no contacts of its own with the United States beyond listing its stock on various exchanges and promoting sales of stock in the United States. Plaintiffs have cited no authority for the proposition that such contacts suffice to establish personal jurisdiction, and the Court is not persuaded that Congress intended for the courts to assert jurisdiction under Rule 4(k)(2) whenever a corporation lists its stock on a United States exchange.

Total's remaining potential contacts with the United States are based on the activities of its subsidiaries. If Total's subsidiaries' contacts were imputed to Total, however, several states would have jurisdiction over Total, and Rule 4(k)(2) would not apply. In fact, plaintiffs' counsel stated at oral argument on August 18, 1998 that because they believe Total is subject to personal jurisdiction in several states under the alter ego and agency doctrines, they need not rely on their

earlier contention that the Court should exercise personal jurisdiction over Total pursuant to Rule 4(k)(2).

#### 2. Rule 4(k)(1)(D) and National Contacts under RICO

■■■ Pursuant to Rule 4(k)(1)(D), "[s]ervice of a summons ... is effective to establish jurisdiction over the person of a defendant ... when authorized by a statute of the United States." Here, plaintiffs have asserted a claim against Total under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The parties agree that RICO provides for nationwide service of process and that where service is effected under RICO, a concomitant national contacts test for personal jurisdiction applies. Total argues, however, that because plaintiffs could not and did not effect service on Total in France under RICO, plaintiffs may not rely on Total's national contacts with the United States as a whole to establish this Court's personal jurisdiction over Total.

When enacting RICO, "Congress provided for service of process upon RICO defendants residing outside the federal court's district when it is shown that 'the ends of justice' require it." *Butcher's Union Local No. 498, United Food and Commercial Workers v. SDC Investment, Inc.*, 788 F.2d 535, 538 (9th Cir.1986) (quoting 18 U.S.C. § 1965(b)).[4]

> For nationwide service of process to be imposed under section 1965(b), the court must have personal jurisdiction over at least one of the participants in the alleged multidistrict conspiracy and the plaintiff must show that there is no other district in which a court will have personal jurisdiction over all of the alleged coconspirators.

*Id.* at 539 (holding ends of justice provision was intended to enable plaintiffs to bring all members of nationwide RICO conspiracy before a court in a single trial). The Court need not consider whether these requirements for nationwide service under RICO are satisfied here because RICO does not provide for worldwide service of process, and Total was served in France pursuant to the Hague Convention.

■■■ Where a defendant is properly served in the United States under RICO's nationwide service provision, that defendant's national contacts, rather than its minimum contacts with the forum state, determine whether the district court has personal jurisdiction over the defendant. *Cf. Go–Video*, 885 F.2d at 1416 ("[W]hen a statute authorizes nationwide service of process, national contacts analysis is appropriate."); *U.S. S.E.C. v. Carrillo*, 115 F.3d 1540, 1543 (11th Cir.1997) (where personal jurisdiction is predicated on federal statute providing for nationwide or worldwide service, relevant inquiry is whether defendant has sufficient minimum contacts with United States).

■■■ Plaintiffs contend that a national contacts test should apply here even though Total was not served in accordance with RICO's provisions for service of process. Put simply, plaintiffs read *Go–Video*'s statement that a national contacts test applies "when a statute *authorizes* nationwide service of process" to mean that so long as a statute provides for nationwide service, a national contacts test will apply to a foreign defendant even though service could not have been effected pursuant to that statute. While plaintiffs' reading is a permissible one, the rationale underlying imposition of a na-

4. Section 1965(b) provides:
> In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

At least one other Circuit has concluded, however, that § 1965(d) is the source of RICO's nationwide jurisdiction over RICO defendants. *See Republic of Panama v. BCCI Holdings (Luxembourg)*

*S.A.*, 119 F.3d 935, 942 (11th Cir.1997). Noting the split in the Circuits, the Second Circuit recently analyzed § 1965 in its entirety and concluded that the Ninth Circuit's reading of § 1965(b) as providing for nationwide service of process was correct. *PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.*, 138 F.3d 65, 72 (2d Cir.1998); *see also Stauffacher v. Bennett*, 969 F.2d 455, 460 (7th Cir.1992) (citing § 1965(b) as authorizing nationwide service of process). Of course, this Court is bound to follow the Ninth Circuit irrespective of the apparent split in the Circuits.

tional contacts test indicates that service must be effected pursuant to RICO's service provisions before a plaintiff may rely on a defendant's national contacts to establish personal jurisdiction over the defendant.

As the Supreme Court explained in *Omni Capital Int'l. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 104, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987), "service of summons is the procedure by which a court having venue and jurisdiction of the subject matter of the suit asserts jurisdiction over the person of the party served." *Id.* (citation and internal marks omitted). Similarly, the Ninth Circuit has stated the general rule that "[a] federal court obtains personal jurisdiction over a defendant if it is able to serve process on him." *Butcher's Union*, 788 F.2d at 538. In *Carrillo*, the Eleventh Circuit explained that the rule that a national contacts test applies where personal jurisdiction is based upon a federal statute that provides for nationwide service "is predicated on the well-settled principle that service of process constitutes the vehicle by which the court obtains jurisdiction." *Id.*, 115 F.3d at 1543 (citation and internal marks omitted). Thus, the rule applies "[w]here process is served pursuant to a federal statute authorizing nationwide or worldwide service[.]" *Id.* In fact, the Ninth Circuit's statement of the rule in *Go–Video* is followed by a parenthetical discussing the national contacts test "when service [is] effected under [the] Clayton Act § 12[.]'" *Go–Video*, 885 F.2d at 1416 (citing *Amtrol, Inc. v. Vent–Rite Valve Corp.*, 646 F.Supp. 1168, 1172 (D.Mass.1986)). Just as it would be unwise for a court to make its own rule authorizing service of summons, *Omni*, 484 U.S. at 109, 108 S.Ct. 404, it would be inappropriate for a federal court to effectively extend the territorial reach of a federal statute by applying a national contacts test for personal jurisdiction where service is not effected pursuant to that federal statute.[5]

In fact, in the only case to directly address the issue, the Seventh Circuit explicitly held, without analysis, that because RICO contains no provision for worldwide service, a plaintiff who attempts to obtain personal jurisdiction over a foreign national served outside the United States "must rely on the long-arm statute of the state in which he files his suit." *Stauffacher v. Bennett*, 969 F.2d 455, 460 (7th Cir.1992); *see also Brink's Mat Ltd. v. Diamond*, 906 F.2d 1519, 1523 (11th Cir. 1990) (holding RICO plaintiff may resort to state long-arm statute to serve foreign defendants abroad and assuming personal jurisdiction question would turn on foreign defendant's contacts with Middle District of Florida); *Biofeedtrac, Inc. v. Kolinor Optical Enterprises & Consultants, S.R.L.*, 817 F.Supp. 326, 332 (E.D.N.Y.1993) (holding

---

5. Rule 4 was amended in 1993 and now includes subsection (k)(2) which corrected a gap noted by the Supreme Court in *Omni*, where the Court held that in the absence of a statutory provision for service, jurisdiction was limited by the state's long-arm statute even in federal question cases. *See* 4 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1067.1 at 118–19 (2d ed. Supp.1998). Relying on the discussion in Wright & Miller, the Second Circuit recently suggested in dicta that in light of the changes to Rule 4, "a strong argument can be made that even where service is made under the forum state's long-arm statute, a federal court may exercise personal jurisdiction as long as such exercise is consistent with the Fifth Amendment due process standard." *Chew v. Dietrich*, 143 F.3d 24, 28 n. 3 (2d Cir.1998) (citing 4 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1075 at 494–95 (2d ed. 1987 & Supp.1997)). It appears to this Court, however, that the changes in Rule 4 merely filled the narrow gap that previously existed where the federal statute in question contained no provision for service of process. Nothing in the alteration

of Rule 4(e) or the addition of Rule 4(k)(2) suggests that a national contacts test is applicable whenever a federal question is presented. Rather, as discussed above, Rule 4(k)(2) provides for a national contacts test only where jurisdiction is not available under any state's long-arm statute. *Cf. Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 418 (9th Cir.1977) ("If policy considerations do indeed dictate that an alien defendant's contacts with the entire United States should be aggregated, and if the Constitution does not forbid such a practice at least where the plaintiff is suing in federal court on a federal cause of action, the Federal Rules should be amended to authorize such a practice. Such a step is, however, not ours to take.")

Although the *Chew* court was not entirely clear about whether it was issuing holdings in the alternative or not, that court ultimately found that even if the court lacked personal jurisdiction over the German defendant under Rhode Island's long-arm statute, jurisdiction was available under Rule 4(k)(2), despite the parties' assumption that Rhode Island law governed the due process issue. *Id.* at 27 n. 2, 28–29.

plaintiff could bring RICO action against persons outside United States by relying on long-arm statute of forum state and stating whether service occurred in New York or abroad determined whether New York jurisdictional statutes applied).

In short, because RICO's "national contacts" test is predicated on the rule that a court may obtain personal jurisdiction over a defendant by effecting service under a federal statute authorizing nationwide or worldwide service, RICO does not apply where, as here, the defendant is served outside of the United States. Consequently, to establish that the Court has personal jurisdiction over Total plaintiffs must rely on the traditional minimum contacts analysis associated with service of process under California's long-arm statute. *See* Fed.R.Civ.P. 4(k)(1)(A).

### 3. Rule 4(k)(1)(A) and California's Long–Arm Statute

Where the federal statute or rule on which an action is premised does not authorize service to obtain jurisdiction over a defendant, the starting point is the forum state's long-arm statute. Fed.R.Civ.P. 4(k)(1)(A). California's long-arm statute extends jurisdiction to the limits of due process. *See* Cal.Code of Civ.Pro. § 410.10.

Constitutional due process concerns are satisfied when a nonresident defendant has "certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional conceptions of fair play and substantial justice." *International Shoe Co. v. State of Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Where a defendant deliberately engages in significant activities within a state, purposely availing itself of the privilege of conducting business there, it is presumptively reasonable to require that defendant "submit to the burdens of litigation in that forum as well." *Burger King v. Rudzewicz,* 471 U.S. 462, 475–76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). In such instances, "defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Id.* at 474, 105 S.Ct. 2174 (citing *World–Wide Volkswagen*

*Corp. v. Woodson,* 444 U.S. 286, 295, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).

Applying the "minimum contacts" analysis, a court may obtain either general or specific jurisdiction over a defendant. If the defendant's activities in the forum are substantial, continuous and systematic, general jurisdiction is available; in other words, the foreign defendant is subject to suit even on matters unrelated to his or her contacts to the forum. *Perkins v. Benguet Consolidated Mining Co.,* 342 U.S. 437, 446, 72 S.Ct. 413, 96 L.Ed. 485 (1952). A court may exercise specific jurisdiction over a foreign defendant if his or her less substantial contacts with the forum give rise to the cause of action before the court. The question is "whether the cause of action arises out of or has a substantial connection with that activity." *Hanson v. Denckla,* 357 U.S. 235, 250–253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958).

The Ninth Circuit has established a three-part test to evaluate the nature and quality of a defendant's contacts so as to determine the availability of specific jurisdiction:

(1) The nonresident defendant must do some act or consummate some transaction within the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws.

(2) The claim must be one which arises out of or results from the defendant's forum-related activities.

(3) Exercise of jurisdiction must be reasonable.

*Gordy v. Daily News, L.P.,* 95 F.3d 829, 831–32 (9th Cir.1996). Incorporating the standards set forth in *Burger King,* the Ninth Circuit has expounded upon the requirements for purposeful availment, noting that purposeful direction of some act having effect in the forum constitutes sufficient contact to exert jurisdiction, and that a lesser showing of contacts with the forum may be sufficient if considerations of reasonableness so require. *Haisten,* 784 F.2d at 1397.

**a) Specific Jurisdiction**

Plaintiffs have not made out a prima facie case that the Court has specific jurisdiction over Total by virtue of its various contracts with Unocal regarding the Yadana pipeline project. Nor have plaintiffs presented sufficient evidence to warrant additional jurisdictional discovery on the issue of specific jurisdiction.

**(1) Purposeful Availment**

 Purposeful availment, which satisfies the first part of the Ninth Circuit test, requires a finding that the defendant "[has] performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state." *Sher v. Johnson*, 911 F.2d 1357, 1362 (9th Cir.1990) (quoting *Sinatra v. National Enquirer, Inc.*, 854 F.2d 1191, 1195 (9th Cir.1988)). However, " 'an individual's contract with an out-of-state party alone [cannot] automatically establish sufficient minimum contacts' to support personal jurisdiction.' " *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 816 n. 9 (9th Cir.1988) (quoting *Burger King*, 471 U.S. at 478, 105 S.Ct. 2174).

In *Burger King*, the Supreme Court explained:

> [W]e have emphasized the need for a "highly realistic" approach that recognizes that "contract" is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." [ ] It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts with the forum.

*Burger King*, 471 U.S. at 478–79, 105 S.Ct. 2174 (citations omitted). The requirement of purposeful availment "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts or of the unilateral activity of another party of a third person." *Id.*

 Total's contractual relations with Unocal do not constitute purposeful avail-

ment of the benefits and protections of California law. Total presents evidence (1) that it entered into those contracts either by fax and telephone or via meetings in Asia, France and Bermuda; (2) that the law governing the contracts is the law of England, Bermuda or Burma; (3) that the oil in the pipeline will go to Thailand, and possibly to Burma, not to the U.S.; and (4) that the contracts all relate to the pipeline in Burma and have nothing to do with California. Plaintiffs' evidence is simply insufficient to satisfy the standard in the Ninth Circuit. *See McGlinchy*, 845 F.2d at 816 (finding contacts insufficient to constitute purposeful availment where (1) contract was negotiated in England; (2) contract made no reference to U.S. as place for resolution of disputes; and (3) no authorized agents were alleged to performed any part of the contract in California).

**(2) Relation between Claims and Contacts**

 To determine whether a claim arises out of forum-related activities, courts apply a "but for" test. *Ballard*, 65 F.3d at 1500. Here, the Court considers whether plaintiffs' claims would have arisen but for Total's contacts with California. *See id.*

Plaintiffs present no evidence, and it seems impossible that they would uncover any, suggesting that the pipeline project would not have gone forward without Total's dealings with Unocal. As Total points out, it is far from under-capitalized. Moreover, Total agreed to take on the Yadana project before seeking bids from potential partners. Consequently, it appears from the evidence presented to date that Unocal's negotiations with Total and MOGE were not necessary to the initiation of the project. Consequently, there is no evidence that Total would not have gone forward with the project but for its negotiations, agreements and consultations with Unocal in California.

**(3) Reasonableness**

 The bare existence of minimum contacts is not sufficient to allow a court to exercise personal jurisdiction over a defendant. The third step of the Ninth Circuit

test requires a finding that assertion of jurisdiction is reasonable. In other words, once the court concludes that a defendant purposefully established minimum contacts with a forum state, and that the claims at issue arise from those contacts, the court must determine whether the assertion of personal jurisdiction would comport with traditional notions of "fair play and substantial justice." *International Shoe*, 326 U.S. at 326, 66 S.Ct. 154.

Plaintiff's evidence is insufficient to establish either purposeful availment or a but-for relationship between Total or its subsidiaries' contractual relations with Unocal in the forum and plaintiffs' claims. Plaintiffs therefore fail to establish specific jurisdiction, and the Court need not reach the third prong of the specific jurisdiction test. Consequently, the Court need not consider the Republic of France's amicus brief for purposes of the inquiry into specific jurisdiction.

### b) General Jurisdiction

■ Due process is satisfied "when in personam jurisdiction is asserted over a nonresident corporate defendant that has 'certain minimum contacts' with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) (quoting *International Shoe*, 326 U.S. at 326, 66 S.Ct. 154). "The Supreme Court has bifurcated this due process determination into two inquiries, requiring, first, that the defendant have the requisite contacts with the forum state to render it subject to the forum's jurisdiction, and second, that the assertion of jurisdiction be reasonable." *Amoco Egypt Oil Co. v. Leonis Navigation Co., Inc.*, 1 F.3d 848, 851 (9th Cir.1993) (citing *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 107, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)). Where, as here, the defendant's alleged contacts are through its corporate subsidiaries, the Court must engage in a preliminary inquiry to determine whether the subsidiaries contacts are properly attributed to the defendant.

### (1) Attributing Contacts of Subsidiaries to the Parent Corporation

■ The existence of a relationship between a parent company and its subsidiaries is not sufficient to establish personal jurisdiction over the parent on the basis of the subsidiaries' minimum contacts with the forum. *Transure, Inc. v. Marsh and McLennan, Inc.*, 766 F.2d 1297, 1299 (9th Cir.1985). As the Supreme Court recently explained in the context of assessing corporate separateness for purposes of liability:

> [I]t is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts. [ ] This recognition that the corporate personalities remain distinct has its corollary in the well established principle of corporate law that directors and officers holding positions with a parent and its subsidiary can and do "change hats" to represent the two corporations separately, despite their common ownership. [ ]

*United States v. Bestfoods*, —— U.S. ——, ——, 118 S.Ct. 1876, 1888, 141 L.Ed.2d 43 (1998) (internal marks and citations omitted). In considering a parent corporation's potential liability under CERCLA, the Supreme Court distinguished "a parental officer's oversight of a subsidiary from such an officer's control over the operation of the subsidiary's facility." *Id.* at 1889. In so doing, the Supreme Court articulated a generally-applicable principle that a parent corporation may be directly involved in the activities of its subsidiaries without incurring liability so long as that involvement is "consistent with the parent's investor status." *Id.* Appropriate parental involvement includes: "monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures[.]" *Id.*

■ Nonetheless, "if the parent and subsidiary are not really separate entities, or one acts as an agent of the other, the local subsidiary's contacts with the forum may be imputed to the foreign parent corporation." *El–Fadl v. Central Bank of Jordan*, 75 F.3d 668, 676 (D.C.Cir.1996). An alter ego or

agency relationship is typified by parental control of the subsidiary's internal affairs or daily operations. *See Kramer Motors, Inc. v. British Leyland, Ltd.,* 628 F.2d 1175, 1177 (9th Cir.1980).[6]

### (a) Alter Ego

■ To demonstrate that the parent and subsidiary are "not really separate entities" and satisfy the alter ego exception to the general rule that a subsidiary and the parent are separate entities, the plaintiff must make out a prima facie case "(1) that there is such unity of interest and ownership that the separate personalities [of the two entities] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice." *American Telephone & Telegraph Co. v. Compagnie Bruxelles Lambert,* 94 F.3d 586, 591 (9th Cir.1996) (citations omitted). The first prong of this test has alternately been stated as requiring a showing that the parent controls the subsidiary "to such a degree as to render the latter the mere instrumentality of the former." *Calvert v. Huckins,* 875 F.Supp. 674, 678 (E.D.Cal.1995).

For example, where a parent corporation uses its subsidiary "as a marketing conduit" and attempts to shield itself from liability based on its subsidiaries' activities, piercing the corporate veil is appropriate and the alter-ego test is satisfied. *Cf. United States v. Toyota Motor Corp.,* 561 F.Supp. 354, 359 (C.D.Cal.1983). That test is also satisfied where the record indicates that the parent dictates "[e]very facet [of the subsidiary's] business—from broad policy decisions to routine matters of day-to-day operation[.]" *Rollins Burdick Hunter of Southern California, Inc. v. Alexander & Alexander Services, Inc.,* 206 Cal.App.3d 1, 11, 253 Cal.Rptr. 338 (Cal. App.2d Dist.1988). Similarly, under California law, "inadequate capitalization of a subsidiary may alone be a basis for holding the parent corporation liable for the acts of the subsidiary." *Slottow v. American Cas. Co. of Reading, Pennsylvania,* 10 F.3d 1355, 1360 (9th Cir.1993).

Plaintiffs argue that several of Total's California subsidiaries and United States subsidiaries with California contacts are alter egos of Total. Plaintiffs do not, and based on the evidence could not, seriously contend that Total is the alter ego of its numerous operating subsidiaries in the United States. Plaintiffs present no evidence that Total is involved in the day-to-day operations of its sub-subsidiaries. *See Apex Oil Co. v. DiMauro,* 744 F.Supp. 53, 58 (S.D.N.Y.1990) (quoting *Bellomo v. Pennsylvania Life Co.,* 488 F.Supp. 744, 745 (S.D.N.Y.1980), and holding proper inquiry for alter ego liability is whether parent exercised day-to-day control of subsidiaries).

■ Rather, plaintiffs argue that Total is the alter ego of several of its subsidiary holding companies based on Total's (1) involvement in its subsidiaries' acquisitions, divestments and capital expenditures; (2) formulation of general business policies and strategies applicable to its subsidiaries, including specialization in particular areas of commerce; (3) provision of loans and other types of financing to subsidiaries; (4) maintenance of overlapping directors and officers with its subsidiaries; and (5) alleged undercapitalization of holding company subsidiaries. A parent corporation may be directly involved in financing and macro-management of its subsidiaries, however, without exposing itself to a charge that each subsidiary is merely its alter ego. *See Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1459–60 (2d Cir.1995) (no alter ego liability where parental approval required for leases, major capital expenditures and the sale of the subsidiary's assets); *Joiner v. Ryder Sys.,* 966 F.Supp. 1478, 1485 (C.D.Ill.1996) (no alter ego liability where parent approved subsidiaries' acquisitions and capital budget); *Akzona, Inc. v. E.I. Du Pont De Nemours and Co.,* 607 F.Supp. 227, 238 (D.Del.1984) (blurring corporate separateness in language of annual report, overlap of boards of directors, parental approval of large capital expenditures, and parental guaranty of third-party loans to subsidiary insufficient to establish alter ego relation-

---

**6.** While the Court follows the alter ego and agency tests as articulated by the Ninth Circuit, the Court notes the useful discussion of alter ego as merger and agency as attribution in *In re Telectronics Pacing Systems, Inc.,* 953 F.Supp. 909 (S.D.Ohio 1997).

ship); *In re Hillsborough Holdings Corp.,* 166 B.R. 461, 473–74 (Bkrtcy.M.D.Fla.1994) (proper for parent to provide all financing to a subsidiary), *aff'd* 176 B.R. 223 (M.D.Fla. 1994).

■ First, the Court notes that plaintiffs' evidence actually indicates that Total's U.S. subsidiaries are adequately capitalized to maintain their holdings, despite the fact that the subsidiary holding companies must obtain approval and financing from Total (or its French subsidiary Hutchinson, S.A.) for new acquisitions. Plaintiffs' argument that subsidiary holding companies are undercapitalized for their intended business of acquiring new operational subsidiaries improperly assumes that a holding company is a sham corporation whenever it has only enough capital to protect its existing holdings. Plaintiffs provide no authority for that proposition.

■ Plaintiffs next assert that Total improperly controls the flow of money to its subsidiaries. Evidence that a parent provides interest free loans without observing corporate formalities by documenting those loans with promissory notes supports a finding that the parent is the subsidiary's alter ego. *Laborers Clean–Up Contract Administration Trust Fund v. Uriarte Clean–Up Service, Inc.,* 736 F.2d 516, 524 (9th Cir. 1984). Here, although plaintiffs present evidence of numerous loans from Total to its subsidiaries, the evidence indicates that the loans are interest-bearing and that Total has maintained the corporate formalities by properly documenting its loans and capital contributions to its subsidiaries.

■ Likewise, references in the parent's annual report to subsidiaries or chains of subsidiaries as divisions of the parent company do not establish the existence of an alter ego relationship. *See Fletcher,* 68 F.3d at 1459–60 (references to subsidiary as "division" of Kodak not equivalent to evidence that two companies operated as "single economic entity"); *Akzona,* 607 F.Supp. at 238 (language of annual report and employee testimony describing subsidiaries as divisions of parent not sufficient, even in conjunction with other evidence, to establish alter ego relationship).

Plaintiffs present a wealth of evidence in support of their opposition to the Motion, but their evidence does not suggest such a unity of interest and ownership between Total and its subsidiaries that their separate corporate personalities no longer exist. *See American Telephone & Telegraph Co.,* 94 F.3d at 591. In a case presenting similar questions, the Ninth Circuit found no alter ego relationship was created where the parent company guaranteed loans for the subsidiary, reviewed and approved major decisions, placed several of its directors on the subsidiary's board, and was closely involved in the subsidiary's pricing decisions. *Kramer Motors, Inc. v. British Leyland, Ltd.,* 628 F.2d 1175, 1177 (9th Cir.1980), cited in *AT & T,* 94 F.3d at 591. Plaintiffs' evidence here establishes only that Total is an active parent corporation involved directly in decision-making about its subsidiaries' holdings. Because Total and its subsidiaries observe all of the corporate formalities necessary to maintain corporate separateness, the first prong of the alter ego test is not satisfied, and the Court need not address the equities.

### (b) Agency

■ The agency test is satisfied by a showing that the subsidiary functions as the parent corporation's representative in that it performs services that are "sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services." *Chan v. Society Expeditions, Inc.,* 39 F.3d 1398, 1405 (9th Cir.1994) (quoting *Wells Fargo,* 556 F.2d at 423). In *Chan,* the Ninth Circuit approved the decision of a Pennsylvania district court and found it appropriate to attribute the subsidiary's contacts to the parent. 39 F.3d at 1405 n. 9 (following *Gallagher v. Mazda Motor of America, Inc.,* 781 F.Supp. 1079, 1083–84 (E.D.Pa.1992)). Rejecting the German corporate defendant's argument that "courts cannot look to the activities of an affiliated corporation for purposes of determining whether its parent corporation was 'doing business' in a state[,]" the *Chan* court explained that "courts have permitted the imputation of contacts where the subsidiary

was 'either established for, or is engaged in, activities that, but for the existence of the subsidiary, the parent would have to undertake itself.' " *Id.* (quoting *Gallagher,* 781 F.Supp. at 1083).

As the *Gallagher* court articulated this rule, if a subsidiary performs functions that the parent would otherwise have to perform, the subsidiary then functions as "merely the incorporated department of its parent." 781 F.Supp. at 1084. Consequently, "[t]he question to ask is not whether the American subsidiaries can formally accept orders for their parent, but rather whether, in the truest sense, the subsidiaries' presence substitutes for the presence of the parent." *Id.* (quoting *Bulova Watch Co., Inc. v. K. Hattori & Co., Ltd.,* 508 F.Supp. 1322, 1342 (E.D.N.Y.1981)).

The *Gallagher* court distinguished an agency relationship between a parent and its subsidiary from that of a holding company and its subsidiary, explaining that in the case of a holding company the parent could simply hold another type of subsidiary, in which case imputing the subsidiaries' jurisdictional contacts to the parent would be improper. *Id.* at 1085 (citing *Bellomo,* 488 F.Supp. at 746). Similarly, the New York district court in *Bellomo* held that:

> [w]here a holding company is nothing more than an investment mechanism[, i.e.,] a device for diversifying risk through corporate acquisitions[,] the subsidiaries conduct business not as its agents but as its investments. The business of the parent is the business of investment, and that business is carried out entirely at the parent level. Where, on the other hand, the subsidiaries are created by the parent, for tax or corporate finance purposes, there is no basis for distinguishing between the business of the parent and the business of the subsidiaries.

488 F.Supp. at 746 (holding foreign insurance company was "super-corporation" engaged in underwriting and selling insurance policies through its subsidiaries); *but see Arch v. American Tobacco Co., Inc.,* 984 F.Supp. 830, 840 (E.D.Pa.1997) (holding subsidiary involved in manufacturing, marketing, selling and distributing cigarettes was not parent company's agent under *Gallagher* test because the parent holding company could simply have held another type of subsidiary).

Here, plaintiffs do not make out a prima facie case that Total's operational subsidiaries in California are its agents for purposes of personal jurisdiction. There is no evidence that in the absence of Total's California subsidiaries involved in petrochemical and chemical operations, Total would conduct and control those operations. Plaintiffs recite a number of facts about Total's subsidiaries from Total's annual reports; however, as the *Calvert* court explained, "consolidating the activities of a subsidiary into the parent's reports is a common business practice." 875 F.Supp. at 678. Total stated in its 1995 annual report that its "US unit," Total Petroleum, Inc., would enable it to expand its marketing network and produce higher value-added specialty products in the United States. That statement is not enough, however, to justify the conclusion that Total would perform the activities of its U.S. operational subsidiaries were they unavailable to act as its "representative."

Plaintiffs' contention that Total's holding company subsidiaries with substantial and continuous contacts in California are Total's agents raises a more interesting question. In *Chan,* the Ninth Circuit considered agency in the context of an operational subsidiary. 39 F.3d at 1404–06. Relying on the district court's opinion in *Bellomo,* plaintiffs contend that Total is a "super-corporation" similar to the corporate defendant in *Bellomo.* As plaintiffs emphasize, Total is a multinational energy corporation that holds extensive business interests in the United States through subsidiary holding companies. Our attention, however, is directed at two subsidiary holding companies based in California, Hutchinson Seal Corporation ("HSC") and C.S. Acquisitions, Inc. ("CSAI"). These two holding companies were created to hold the stock of several California operating companies. Although the Court was concerned that Total's indirect subsidiary holding companies were actively involved in finding operating companies to add to Total's business portfolio, Total has shown that HSC and CSAI have not played any role in finding companies to acquire in California or the

United States, or in effectuating any such acquisitions. See Mounier and Davis Declarations. Indeed, neither HSC nor CSAI has any employees.

As noted above in connection with plaintiffs' alter ego argument, the fact that Total indirectly owns or holds the stock of HSC and CSAI does not, without more, convert these two corporations into general agents for Total for jurisdictional purposes under the Ninth Circuit's agency test articulated in *Wells Fargo* and *Chan*. At an irreducible minimum, the general agency test requires that the agent perform some service or engage in some meaningful activity in the forum state on behalf of its principal such that its "presence substitutes for presence of the principal." *Gallagher*, 781 F.Supp. at 1084. The Court agrees with Total that "neither HSC nor CSAI perform any services or activities for Total. They merely hold assets nothing more." Total's September 9, 1998 Suppl. Memo. at 7. Further, the Court also agrees with Total, as noted by its counsel at the August 28, 1998 hearing, that in the absence of the two California subsidiary holding companies, Total could simply hold the stock of its California operating companies directly as a foreign corporation. Moreover, as a multinational energy company, Total could establish other subsidiary holding companies located in some other state or country to hold the stock of the operating companies located in California. Under these circumstances, it simply can not be said that CSAI or HSC are Total's general agents for jurisdictional purposes.

Although plaintiffs' argument is based on *Bellomo*, the Court is not persuaded that it should follow the *Bellomo* court's analysis here. In *Bellomo*, the defendant insurance company, Pennsylvania Life, "engaged primarily in underwriting and selling a variety of insurance policies through several subsidiaries [in the forum state]." 488 F.Supp. at 747. The *Bellomo* court characterized Pennsylvania Life, which was a holding company, as a "super-corporation" and not a mere investor in other businesses. Taking their clue from *Bellomo*, plaintiffs argue that Total's world wide holdings and its stated corporate policy of investing in selected niche markets through acquisitions of businesses that further that strategy, show that Total is a "super-corporation" that conducts its energy related businesses through selectively acquired operating companies. By maintaining control of the operating companies through its subsidiary holding companies, plaintiffs argue that the subsidiary companies should be treated as Total's general agents in California for purposes of establishing personal jurisdiction over Total. As noted above, however, the record does not support plaintiffs' contention that Total directly controls the day-to-day activities of the California operating or holding companies. The fact that Total may indirectly control or supervise its subsidiaries, does not lead the Court to a different conclusion.

In sum, the Court finds that plaintiffs have not met their burden of showing that Total's subsidiaries with substantial California contacts should be treated as Total's general agents for jurisdictional purposes under the agency doctrine adopted by the Ninth Circuit in *Wells Fargo* and *Chan*. Because the Court has concluded that Total does not have sufficient contacts with California, the Court need not reach the final prong of the general jurisdictional analysis—whether the exercise of jurisdiction over Total would be reasonable. See *Asahi Metal Industry Co., Ltd. v. Superior Court*, 480 U.S. 102, 113, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).

## III.

### Conclusion

For the foregoing reasons, defendant Total S.A.'s motion to dismiss for lack of personal jurisdiction is **GRANTED.**

**IT IS SO ORDERED.**