328 F.3d 1122
 HARRIS RUTSKY & CO. INSURANCE SERVICES, INC., d/b/a American Special Risk Insurance Services, a California corporation, Plaintiff-Appellant,
v.
BELL & CLEMENTS LIMITED; Bell & Clements (London) Limited, Defendants-Appellees.
 No. 01-57053.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted December 4, 2002.
 Filed May 12, 2003.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Stephen F. Harbison, Argue Pearson Harbison & Myers, LLP, Los Angeles, CA, argued the cause for the appellant. Thomas R. Schalow, Argue Pearson Harbison & Myers LLP, Los Angeles, CA, and Andrew M. Polinsky, Dorais & Grattan, Goleta, CA, were on the briefs.
 Phillip J. Eskenazi, Los Angeles, CA, argued the cause for the appellee. Barry A. Chasnoff and Laura A. Hernandez, Akin Gump Strauss Hauer & Feld, LLP, were on the brief.
 Appeal from the United States District Court for the Central District of California; Ronald S.W. Lew, District Judge, Presiding. D.C. No. CV-01-07661-RSWL.
 Before REINHARDT, O'SCANNLAIN and PAEZ, Circuit Judges.
 OPINION
 O'SCANNLAIN, Circuit Judge.
 
 
 1
 We are asked to decide whether a federal district court in California can properly exercise personal jurisdiction over London, England-based entities alleged to have interfered with a California corporation's contractual and business relations by their actions in Europe.
 
 
 2
 * Harris Rutsky & Co., dba American Special Risk Insurance Services ("ASR") is a California corporation, whose principal place of business is Woodland Hills, California. ASR is an insurance brokerage firm, licensed and regulated under the laws of California. ASR customarily enters into agreements with nonadmitted foreign surplus line insurers. Such a contract — the industry parlance is `coverholder agreement' — allows ASR, acting as the foreign insurer's agent, to bind the foreign insurer to coverage in California. The foreign insurer thereby gains access to California's lucrative insurance markets, from which it is otherwise barred.
 
 
 3
 Sometime prior to 1996, ASR entered into a coverholder agreement with Zurich Reinsurance (London) Limited ("Zurich"), a London-based surplus lines insurer. The agreement called for a Lloyd's-affiliated insurance broker to act as an intermediary between the parties. The intermediary under this agreement was Byas Mosley, Ltd. David Doe was the representative at Byas Mosley who worked with ASR. Through its relationship with Doe, ASR had worked to cultivate its relationship with Zurich, and with other London-based insurers.
 
 
 4
 In 1996, David Doe left Byas Mosley and associated himself with Bell & Clements, Ltd., a United Kingdom corporation ("B & C"), and a Lloyd's-affiliated insurance broker. B & C is wholly owned by Bell & Clements London, Ltd. ("B & C-London"), a United Kingdom holding company. Both B & C and B & C-London are run by the same senior officers and directors, they share the same offices and utilize many of the same staff, at the same location in London, England.
 
 
 5
 Doe avers that B & C sought to associate with Doe to acquire his North American clients, and in particular Doe's "most important" client, ASR. After Doe joined B & C, principals at B & C communicated with ASR by facsimile. B & C stated it was pleased that David Doe was joining them, and that it looked forward to its relationship with ASR, and introduced those B & C employees who would work on day-to-day broker tasks for ASR. Doe and B & C agreed to set up a subsidiary—Bell, Clements & Doe, Ltd. ("BC & D"). BC & D was sixty percent owned by B & C-London, and its purpose was to provide equity for Doe in consideration for the business he brought with him when he joined B & C, including the ASR account. Doe himself made certain prior to joining B & C that ASR would transfer its business to B & C, which it did.
 
 
 6
 When Doe joined B & C in 1996, it succeeded Byas Mosley as authorized broker pursuant to the ASR-Zurich agreement, and acted in that capacity until 1999, when ASR and Zurich entered into a new agreement. The 1999 agreement was drafted by B & C. B & C mailed the contract to ASR in California, already signed by Zurich, and ASR ratified the new agreement by executing it in California and returning it to B & C. The contract named B & C as the recognized broker for the parties "on behalf of BC & D." B & C was due a five percent commission on net premiums in their capacity as the intermediary. The contract further provided that all communications between ASR and Zurich, including account advices, were to go through B & C. All claims were to be "notified by American Special Risk to Insurers via Bell & Clements Limited." 1999 Contract Agreement, at 17. A service of suit clause required the underwriters—ASR—to "submit to the jurisdiction of a Court of competent jurisdiction within the United States" at the request of an insured, and a Los Angeles, California law firm was designated as the service of suit nominee.
 
 
 7
 David Doe and B & C's affiliation lasted for approximately five years, from 1996 to November, 2000. During that time, ASR paid premiums to B & C from insureds — the majority of which were Californian — totaling approximately $45 million. B & C's commission on those premiums exceeded $2 million. ASR and B & C communicated with each other frequently during this time period, via fax, phone and mail. All communications from B & C were on B & C letterhead.
 
 
 8
 London-based B & C employees visited California approximately eight times per year for business purposes during the relevant time period. The B & C representatives never met with ASR, but Doe avers that the trips comprised a regular part of B & C's business, and that they were instrumental in creating new lines of business for B & C with California-licensed brokers like ASR, willing to act as agents for foreign surplus line insurers. B & C apparently acts as an intermediary for several other California-licensed brokers. In addition to the visits to California, B & C has an "American Division" link on its website, which claims B & C is a "market leader in the provision and management of binding authorities for wholesale underwriting intermediaries and managing general agents in the American insurance industry." Doe estimates that twenty percent of B & C's overall business comes from California.
 
 
 9
 In November 2000, David Doe left B & C and joined another London broker — Alwen-Hough, Ltd. ASR alleges Doe was forced out of the company in a deliberate effort to disrupt the various relationships ASR had with London insurers, and specifically their relationship with Zurich. A month later, Zurich terminated its agreement with ASR. ASR alleges that it did so at the behest of B & C and B & C-London. ASR further alleges that early in 2001, B & C and B & C-London approached other London insurers with whom ASR had relationships, and urged them to cease doing business with ASR, which they did.
 
 
 10
 ASR filed suit against B & C and B & C-London in California state court, alleging state law claims for tortious interference with contract, tortious interference with prospective economic advantage, breach of fiduciary duties, and unfair competition. B & C and B & C-London subsequently removed the case to federal district court on the basis of diversity, and filed a motion to dismiss for lack of personal jurisdiction, or alternatively for forum non conveniens. ASR moved for jurisdictional discovery, which was denied. The district court then granted the motion to dismiss for lack of personal jurisdiction. ASR timely appeals.
 
 II
 
 11
 We review de novo the district court's decision to dismiss for lack of personal jurisdiction. Ochoa v. J.B. Martin and Sons Farms, Inc., 287 F.3d 1182, 1187 (9th Cir.2002). It is ASR's burden to establish the district court's personal jurisdiction over the defendants. Doe, I v. Unocal Corp., 248 F.3d 915, 922 (9th Cir. 2001) (per curiam).
 
 
 12
 Here, the district court acted on the defendant's motion to dismiss without first holding an evidentiary hearing. In such a case, the plaintiff need only make a prima facie showing of jurisdiction to avoid the defendant's motion to dismiss. Id. ASR "need only demonstrate facts that if true would support jurisdiction over the defendant." Id. (quoting Ballard v. Savage, 65 F.3d 1495, 1498 (9th Cir.1995)). Unless directly contravened, ASR's version of the facts is taken as true, and "conflicts between the facts contained in the parties' affidavits must be resolved in [ASR's] favor for purposes of deciding whether a prima facie case for personal jurisdiction exists." Doe, I, 248 F.3d at 922 (quoting AT & T v. Compagnie Bruxelles Lambert, 94 F.3d 586, 588 (9th Cir. 1996)); see also Bancroft & Masters, Inc. v. Augusta Nat'l, Inc., 223 F.3d 1082, 1087 (9th Cir.2000) ("Because the prima facie jurisdictional analysis requires us to accept the plaintiff's allegations as true, we must adopt [plaintiff]'s version of events for purposes of this appeal.").
 
 
 13
 Where, as here, there is no applicable federal statute governing personal jurisdiction, the law of the state in which the district court sits applies. Core-Vent Corp. v. Nobel Industries AB, 11 F.3d 1482, 1484 (9th Cir.1993). California's long-arm statute allows courts to exercise personal jurisdiction over defendants to the extent permitted by the Due Process Clause of the United States Constitution. See Cal.Code Civ. Pro. § 410.10 ("A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States."); Core-Vent, 11 F.3d at 1484. Hence, we "need only determine whether personal jurisdiction in this case would meet the requirements of due process." Brainerd v. Governors of the Univ. of Alberta, 873 F.2d 1257, 1258 (9th Cir.1989).
 
 
 14
 Due process requires "that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend `traditional notions of fair play and substantial justice.'" International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). To determine whether the district court can exercise specific jurisdiction over the defendants,[1] we apply the following three-part test:
 
 
 15
 (1) the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privileges of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.
 
 
 16
 Core-Vent, 11 F.3d at 1485 (quoting Lake v. Lake, 817 F.2d 1416, 1421 (9th Cir. 1987)).
 
 
 17
 ASR filed suit against two foreign corporations — B & C and B & C-London. Personal jurisdiction over each defendant must be analyzed separately. Brainerd, 873 F.2d at 1258.
 
 
 18
 * We first consider whether specific jurisdiction may be exercised over B & C.
 
 
 19
 * ASR argues that B & C purposefully availed itself of the privilege of conducting business in California. The purposeful availment prong of the minimum contacts test requires a "qualitative evaluation of the defendant's contact with the forum state," Lake, 817 F.2d at 1421, in order to determine whether "[B & C's] conduct and connection with the forum State are such that [B & C] should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). The purposeful availment requirement is met if the defendant "performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state." Sher v. Johnson, 911 F.2d 1357, 1362 (9th Cir.1990). Physical contact with the forum state is not a necessary condition, "within the rubric of purposeful availment, the [Supreme] Court has allowed the exercise of jurisdiction over a defendant whose only `contact' with the forum state is the `purposeful direction' of a foreign act having effect in the forum state." Haisten v. Grass Valley Medical Reimbursement Fund Ltd., 784 F.2d 1392, 1397 (9th Cir. 1986) (citing Calder v. Jones, 465 U.S. 783, 789, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984)).
 
 
 20
 Crediting, as we must, ASR's version of the facts contained in the affidavits and submitted documentary evidence, it appears that B & C had sufficiently extensive contacts with California to support a finding that it purposefully availed itself of the privilege and opportunity of doing business in California. The physical contacts — approximately forty business trips over a five-year period — do not of themselves weigh in favor of an exercise of specific jurisdiction because they are not related to the claims made against B & C. See Ballard, 65 F.3d at 1498 (discounting business trips to California because unrelated to claim). B & C does not dispute, however, that it has numerous "ongoing obligations to [California] residents." Id. It acts as Lloyd's-affiliated London broker for several California-qualified insurers, including ASR, and Doe estimates twenty percent of its business is conducted in the California insurance markets. B & C specifically sought to associate itself with Doe so as to acquire ASR's business, and it had numerous contacts with ASR during the relevant time period, communicating regularly with ASR via phone, fax and mail respecting the ASR-Zurich account.
 
 
 21
 While B & C generally does not dispute the nature and amount of the contacts, it claims that they are not properly attributable to B & C because ASR is BC & D's client, and not B & C's. Therefore, the contacts over the four-year period during which John Doe was affiliated with them were on behalf of BC & D, and not B & C. This assertion is not supported by the record. It was B & C which specifically sought to affiliate itself with David Doe in order to acquire his North American clients and specifically his "most important" client, ASR. For the next four years, B & C "on behalf of BC & D" was the authorized broker under the Zurich-ASR agreements. Indeed, Zurich insisted on a Lloyd's-affiliated broker as an intermediary, and B & C, not BC & D, is a Lloyd's affiliate. All documentary communications to ASR — statements of account, memoranda, letters, and such like — were on B & C letterhead. Approximately $45 million in checks were made out to B & C, not BC & D, over the course of their relationship. Furthermore, the 1999 agreement was drafted by B & C, on B & C letterhead. In 2001, B & C wrote to ASR, insisting that "we [B & C] are entitled to a `London Brokers' Commission' under this agreement," and putting ASR "on notice that we [B & C] regard both ASR and Zurich as having been contractually bound to us (for and on behalf of [BC & D]) to pay to us the Commission." In sum, the contacts alleged by ASR are properly attributable to B & C.
 
 
 22
 Under our precedents, those contacts are more than sufficient to support a finding of purposeful availment. In Haisten, 784 F.2d at 1392, for example, we found jurisdiction over a Cayman Islands insurance company that had issued twenty-two malpractice insurance policies to California residents. The policies were solicited, issued, delivered and paid for in the Cayman Islands, and the policies were governed by Cayman Island law. Id. at 1398-99. We nevertheless found specific jurisdiction appropriate because the company had purposefully directed its activities toward California. Id. By comparison, B & C purposefully sought out a business relationship with a California corporation, had ongoing contacts with the state over a five-year period, and drafted an agreement which called for performance, and was consummated in, California. There is little question on these facts that B & C "purposefully availed itself of the benefit and privilege of conducting activities in California." Id. at 1400.
 
 
 23
 Nonetheless B & C argues that the purposeful availment test cannot be met because the conduct which forms the basis for the alleged torts—interference with contract and business relations—took place in London. But the purposeful availment test may also be satisfied if the defendant intentionally directed his activities into the forum state. Brainerd, 873 F.2d at 1259. The "effects" test—derived from the Supreme Court's decision in Calder v. Jones, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984) — may be satisfied if the defendant is alleged to have (1) committed an intentional act; (2) expressly aimed at the forum state; (3) causing harm, the brunt of which is suffered — and which the defendant knows is likely to be suffered — in the forum state. Core-Vent, 11 F.3d at 1486.
 
 
 24
 First, B & C is alleged to have committed an intentional tort—interference in ASR's contractual and economic relationships. See Brainerd, 873 F.2d at 1259-60 (court in Arizona had personal jurisdiction over Canadian defendant alleged to have intentionally interfered with contract in Arizona). Second, B & C knew, of course, that ASR was a California resident, and so the alleged acts were expressly aimed at ASR — a California resident. See Bancroft & Masters, Inc., 223 F.3d at 1087 ("express aiming" requirement satisfied when the defendant alleged to have engaged in wrongful conduct targeted at plaintiff whom defendant knows to be resident of forum state). Third, ASR is a California corporation whose principal place of business is in California, and the brunt of the harm was therefore felt in California. See Dole Food Co., Inc. v. Watts, 303 F.3d 1104, 1114 (9th Cir.2002) ("[W]hen a forum in which a plaintiff corporation has its principal place of business is in the same forum toward which defendants expressly aim their acts, the `effects' test permits that forum to exercise personal jurisdiction."). In sum, under our precedents the facts alleged here are more than sufficient to satisfy the "effects" test.
 
 2
 
 25
 Next, we must determine whether the claims made against B & C arise out of their California-related activities. We use a "but for" test to make that determination. Ballard, 65 F.3d at 1500 (citing Shute v. Carnival Cruise Lines, 897 F.2d 377 (9th Cir.1990), rev'd on other grounds, 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991)). B & C had ongoing contacts with the forum state over a four-year period, and its alleged tortious conduct in London had the effect of injuring ASR in California. But for B & C's conduct, this injury would not have occurred. We are satisfied that ASR's claims arise out of B & C's California related activities.
 
 3
 
 26
 Once it has been decided that a defendant purposefully established minimum contacts with a forum, "he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable" in order to defeat personal jurisdiction. Burger King v. Rudzewicz, 471 U.S. 462, 477, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). We consider seven factors in weighing reasonableness:
 
 
 27
 (1) the extent of the defendants' purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.
 
 
 28
 Core-Vent, 11 F.3d at 1487-88 (citing Paccar Int'l, Inc. v. Commercial Bank of Kuwait, 757 F.2d 1058, 1065 (9th Cir.1985)). No one of the factors is dispositive in itself. Instead, we are to balance all seven. Roth v. Garcia Marquez, 942 F.2d 617, 623 (9th Cir.1991).
 
 
 29
 * We first consider the extent of B & C's purposeful interjection into the forum state. Even though we have already determined that B & C purposefully availed itself of the privilege of doing business in California, the degree of interjection is nonetheless a factor in assessing the overall reasonableness of jurisdiction under this prong. See Ins. Co. of North America v. Marina Salina Cruz, 649 F.2d 1266, 1271 (9th Cir.1981).
 
 
 30
 As detailed previously, B & C's contacts with California are fairly extensive. Twenty percent of its business is conducted in California, and that business is a lucrative one. Contact with ASR during that time was frequent. Furthermore, B & C drafted the contract at the heart of this dispute, and that contract was consummated and for the most part performed in California. In those cases where we have found this factor to weigh in favor of the defendant, the contacts are far more attenuated. See, e.g., Core-Vent, 11 F.3d at 1488 (defendants' only contact with forum state was writing article alleged to have targeted a California resident). We conclude that this factor weighs in favor of ASR.
 
 
 31
 b
 
 
 32
 "The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." Asahi Metal Ind. v. Superior Court, 480 U.S. 102, 114, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). B & C claims that, were it forced to litigate in California, it would constitute an "overwhelming and undue burden" on it. Appellees' Brief, at 25. While no doubt it imposes a burden on B & C, it could hardly be overwhelming. As explained, B & C associates frequently travel to California on business, and we have previously noted that "modern advances in communications and transportation have significantly reduced the burden of litigating in another country." Sinatra v. National Enquirer, 854 F.2d 1191, 1199 (9th Cir. 1988). Furthermore, B & C does not face the additional burden of overcoming a language barrier. See Dole Food Co., 303 F.3d at 1115 (fact that foreign defendants fluent in English a "mitigating factor"). Nonetheless, this factor cuts in favor of B & C, and away from the exercise of jurisdiction.
 
 
 33
 c
 
 
 34
 Next, we must determine the extent to which the exercise of jurisdiction would conflict with the sovereignty of the defendants' state. "Litigation against an alien defendant creates a higher jurisdictional barrier than litigation against a citizen from a sister state because important sovereignty concerns exist." Sinatra, 854 F.2d at 1199. Although this factor is important, it is not controlling. See Gates Learjet Corp. v. Jensen, 743 F.2d 1325, 1333 (9th Cir.1984) ("If [this factor were] given controlling weight, it would always prevent suit against a foreign national in a United States court.").
 
 
 35
 While B & C has presented no evidence of the United Kingdom's particular interest in adjudicating this suit, we may presume for present purposes that there is such an interest. The disputed conduct took place in London, and a London-based Lloyd's-affiliated brokerage firm and its British corporate parent are named defendants. Furthermore, employees of Zurich, based in London, are potential witnesses. This factor therefore weighs in favor of B & C.
 
 
 36
 d
 
 
 37
 We next consider the extent of California's interest in adjudicating the suit. "California maintains a strong interest in providing an effective means of redress for its residents [who are] tortiously injured." Sinatra, 854 F.2d at 1200. Here, the plaintiff ASR is a California corporation whose principal place of business is in California. This factor therefore weighs in ASR's favor.
 
 
 38
 e
 
 
 39
 We must also consider which forum could most efficiently resolve this dispute. To make this determination we focus on the location of the evidence and witnesses. Caruth v. International Psychoanalytical Ass'n, 59 F.3d 126, 129 (9th Cir.1995). There is no dispute that almost all of the evidence and the potential witnesses reside in London, and so therefore this factor favors B & C. Note, however, that this factor is "no longer weighed heavily given the modern advances in communication and transportation." Panavision International v. Toeppen, 141 F.3d 1316, 1323 (9th Cir.1998).
 
 
 40
 f
 
 
 41
 We next consider the convenience and effectiveness of relief available to the plaintiff. If California is not a proper forum, ASR would be forced to litigate its claim in the United Kingdom, presenting an obvious inconvenience. This factor therefore weighs in favor of ASR. However, we have said previously that this factor is not of paramount importance. See, e.g., Dole Food Co., 303 F.3d at 1116; Caruth, 59 F.3d at 129. "[N]o doctorate in astrophysics is required to deduce that trying a case where one lives is almost always a plaintiff's preference." Roth, 942 F.2d at 624.
 
 
 42
 g
 
 
 43
 Finally, we must determine whether an adequate alternative forum exists. The plaintiff bears the burden of proving the unavailability of an alternative forum, Core-Vent, 11 F.3d at 1490, and ASR has not met that burden here. British courts provide an obvious alternative forum, and B & C has declared itself amenable to service of process in London. Cf. Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254 n. 22, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) (noting for purposes of a forum non conveniens analysis that an alternative forum generally exists when defendant is amenable to service of process in the foreign forum). This factor therefore favors B & C.
 
 
 44
 h
 
 
 45
 On balance, we conclude that B & C has not met its burden of presenting a compelling case that the exercise of jurisdiction would not comport with fair play and substantial justice. The balance is essentially a wash, since some of the reasonableness factors weigh in favor of B & C, but others weigh against it. See Roth, 942 F.2d at 625 (finding exercise of jurisdiction was reasonable even though only two reasonableness factors favored plaintiff, while three favored defendant).
 
 
 46
 B & C relies in large part on our decision in Core-Vent to argue that the exercise of jurisdiction in this case would be unreasonable, but that reliance is misplaced. The defendants in Core-Vent were two Swedish individuals alleged to have written an article which had defamatory effects in California, and who had no physical contacts whatsoever with the United States. 11 F.3d at 1489. In contrast, B & C has several California-based relationships, including a contractual one with ASR. After purposefully seeking out a financially lucrative relationship with ASR, it communicated with ASR on a regular basis over a four-year period. Given the quantity and quality of the contacts with the forum state, it is not unreasonable for a court in California to exercise personal jurisdiction over B & C.
 
 B
 
 47
 We now turn to the question whether the district court can exercise specific jurisdiction over B & C-London. ASR does not argue that B & C-London itself had the necessary minimum contacts with California to give rise to a valid exercise of personal jurisdiction. Rather, ASR contends that B & C-London's wholly-owned subsidiary, B & C, had such contacts, and that those contacts can properly be imputed to B & C-London for jurisdictional purposes. Since we have already determined that ASR has made out a prima facie case that B & C had the necessary contacts with the forum, the only question before us is whether those contacts may be attributed to B & C-London.
 
 
 48
 It is well-established that a parent-subsidiary relationship alone is insufficient to attribute the contacts of the subsidiary to the parent for jurisdictional purposes. Doe, I, 248 F.3d at 925; Transure, Inc. v. Marsh and McLennan, Inc., 766 F.2d 1297, 1299 (9th Cir.1985). Two exceptions to that general rule exist, however—a subsidiary's contacts may be imputed to the parent where the subsidiary is the parent's alter ego, or where the subsidiary acts as the general agent of the parent. Doe, I, 248 F.3d at 928-30; Chan v. Society Expeditions, Inc., 39 F.3d 1398, 1405-06 (9th Cir.1994); Kramer Motors, Inc. v. British Leyland, Ltd., 628 F.2d 1175, 1177-78 (9th Cir.1980); Wells Fargo & Co. v. Wells Fargo Express Co., 556 F.2d 406, 422-24 (9th Cir.1977).
 
 
 49
 To satisfy the alter ego exception to the general rule that a subsidiary and the parent are separate entities, the plaintiff must make out a prima facie case "(1) that there is such unity of interest and ownership that the separate personalities [of the two entities] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice." Doe, I, 248 F.3d at 926 (alterations in original) (quoting AT & T Co., 94 F.3d at 591). The plaintiff must show that the parent exercises such control over the subsidiary so as to "render the latter the mere instrumentality of the former." Id. at 926 (quoting Calvert v. Huckins, 875 F.Supp. 674, 678 (E.D.Cal.1995)).
 
 
 50
 To satisfy the agency test, the plaintiff must make a prima facie showing that the subsidiary represents the parent corporation by performing services "sufficiently important to the [parent] corporation that if it did not have a representative to perform them, the [parent] corporation... would undertake to perform substantially similar services." Chan, 39 F.3d at 1405 (quoting Wells Fargo & Co., 556 F.2d at 423). The agency test permits the imputation of contacts where the subsidiary was "either established for, or is engaged in, activities that, but for the existence of the subsidiary, the parent would have to undertake itself." Chan, 39 F.3d at 1405-06 n. 9 (quoting Gallagher v. Mazda Motor of America, Inc., 781 F.Supp. 1079, 1083 (E.D.Pa.1992)).
 
 
 51
 Returning to the facts of this case, we know that B & C-London wholly owns B & C, but 100% control through stock ownership does not by itself make a subsidiary the alter ego of the parent. See Bellomo v. Pennsylvania Life Co., 488 F.Supp. 744, 745 (S.D.N.Y.1980) (citing Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925)). We know also that the companies are run by the same senior officers and directors—John Clements is the principal owner of B & C-London and is the chairman of B & C's board—and that the two companies share the same offices in London, and some of the same staff. Again, these facts do not necessarily render B & C the alter ego or agent of B & C-London. We recently explained that "a parent corporation may be directly involved in the activities of its subsidiaries without incurring liability so long as that involvement is consistent with the parent's investor status." Doe, I, 248 F.3d at 926 (quotation omitted). On the other hand, the record indicates that John Clements drafted the 1999 ASR-Zurich agreement. Such activity might well be properly characterized as inconsistent with the parent corporation's investor status, and more like control over day-to-day activities. Standing by itself, however, it is not enough to meet the alter ego or agency tests.
 
 
 52
 The record is simply not sufficiently developed to enable us to determine whether the alter ego or agency tests are met. This is so because the district court denied ASR's motion for jurisdictional discovery. Further discovery on this issue might well demonstrate facts sufficient to constitute a basis for jurisdiction, see Wells Fargo & Co., 556 F.2d at 431 n. 24, and in the past we have remanded in just such a situation. See Chan, 39 F.3d at 1405-6 (remanding to district court because insufficient record facts to decide whether alter ego or agency tests met so as to attribute subsidiary's minimum contacts to parent). We must conclude, therefore, that the district court abused its discretion in denying ASR's motion for jurisdictional discovery, and that a remand will be necessary to allow ASR the opportunity to develop the record and make a prima facie showing of jurisdictional facts with respect to B & C-London.
 
 III
 
 53
 B & C and B & C-London argue that even if we were to find the district court erred in dismissing the case for lack of personal jurisdiction, we can nonetheless affirm the district court on the alternative ground of forum non conveniens. Even if personal jurisdiction is established, a district court may decline to exercise jurisdiction on the basis of forum non conveniens if an adequate alternative forum exists, and the balance of public and private factors favors dismissal. See Piper Aircraft Co., 454 U.S. at 241, 102 S.Ct. 252; Lueck v. Sundstrand Corp., 236 F.3d 1137, 1142 (9th Cir.2001).
 
 
 54
 ASR argues that, because the district court did not consider the forum non conveniens issue, we may not reach it. This is incorrect—we "may affirm [the district court] on any basis the record supports, including one the district court did not reach." Oregon Short Line Railroad Co. v. Oregon Dep't of Revenue, 139 F.3d 1259, 1265 (9th Cir.1998) (quoting Herring v. FDIC, 82 F.3d 282, 284 (9th Cir.1995)); see also Dole Food Co., 303 F.3d at 1117-18 (reaching forum non conveniens issue not reached by district court).
 
 
 55
 While we have the discretion to reach this issue, we nevertheless decline to do so. Normally, the determination whether or not to dismiss a suit on forum non conveniens grounds is within the sound discretion of the trial judge. On review, we may only reverse if we find the trial judge abused that discretion. See Kukje Hwajae Ins. Co. v. M/V HYUNDAI LIBERTY, 294 F.3d 1171, 1174 (9th Cir. 2002). Because it is a discretionary decision, we might (or might not) affirm the district court judge whichever way it ruled. Our reaching this issue now would deprive the district court of an opportunity to exercise the discretion it is afforded in the first instance. We are also presented with obstacles to an efficient and just resolution at this stage in the litigation—the record is currently underdeveloped, and ASR did not address the merits of the issue on appeal, depriving us of the benefit of a counter-argument. See Dole Food Co., 303 F.3d at 1117-18 (reaching forum non conveniens because "the record [was] sufficiently developed and the issue [was] presented and argued" to the court). In short, we decline to reach the forum non conveniens issue.
 
 IV
 
 56
 In sum, we reverse the district court's dismissal for lack of personal jurisdiction over B & C. We reverse the district court's decision to deny jurisdictional discovery with respect to B & C-London. We decline to reach the alternative ground of forum non conveniens. We remand to the district court for further proceedings not inconsistent with this opinion.
 
 
 57
 REVERSED and REMANDED.
 
 
 
 Notes:
 
 
 [1]
 Of course, a court may also exercise general jurisdiction over a defendant who has had continuous and systematic contacts with the forum state. However, ASR has waived any argument based on general jurisdiction because it did not argue it in its opening briefSee Officers For Justice v. Civil Service Commission, 979 F.2d 721, 727 (9th Cir.1992) ("We will not ordinarily consider matters on appeal that are not specifically and distinctly raised and argued in appellant's opening brief.") (quotations omitted).