**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BARBARA BAUMAN; GREGORY
GRIECO; JOSEFINA NUNEZ; GABRIELE
NUNEZ; MIRIAM NUNEZ; SILVIA
NUNEZ; EMILIO GUILLERMO PESCE;
MIRTA HAYDEE ARENAS; GRACIELA
GIGENA; GUILLERMO ALBERTO
GIGENA; NURIA GIGENA; AMELIA
SCHIAFFO; ELBA LEICHNER;
ANUNCIACION SPALTRO DE
BELMONTE; HECTOR RATTO;
EDUARDO OLASIREGUI; RICARDO
MARTIN HOFFMAN; EDUARDO
ESTIVILLE; ALFREDO MANUEL
MARTIN; JUAN JOSE MARTIN; JOSE
BARREIRO; ALEJANDRO DAER,
            *Plaintiffs-Appellants,*

                v.

DAIMLERCHRYSLER CORPORATION;
DAIMLERCHRYSLER AG,
            *Defendant-Appellee.*

No. 07-15386

D.C. No.
CV-04-00194-RMW

OPINION

Appeal from the United States District Court
for the Northern District of California
Ronald M. Whyte, District Judge, Presiding

Argued and Submitted
October 21, 2008—San Francisco, California

Filed August 28, 2009

Before: Mary M. Schroeder, Dorothy W. Nelson, and
Stephen Reinhardt, Circuit Judges.

11997

Opinion by Judge D.W. Nelson;
Dissent by Judge Reinhardt

**COUNSEL**

Terry Collingsworth and Natacha Thys, International Rights Advocates, Washington, D.C., for the plaintiffs-appellants.

Matthew J. Kemner, Carroll, Burdick & McDonough LLP, San Francisco, California, for the defendant-appellee.

## OPINION

D.W. NELSON, Senior Circuit Judge:

Barbara Bauman and 22 other Argentinian residents filed a lawsuit under the Alien Tort Claims Act against Daimler-Chrysler AG for human rights violations allegedly committed by Mercedes Benz Argentina, its subsidiary, in Argentina during the 1970s military regime. DaimlerChrysler AG filed a successful Rule 12(b)(2) motion, the lawsuit was dismissed for lack of personal jurisdiction, and this appeal ensued. We affirm.

*STATEMENT OF FACTS AND PROCEDURAL HISTORY*

Appellants are 23 Argentinian citizens and residents[1] who allege, *inter alia*, that they (or their family members) were kidnapped, detained, or tortured by Argentinian state security forces acting at the direction of their former employer, Mercedes Benz Argentina ("MBA"). Appellants allege that during the military regime that governed Argentina from 1976 to 1983, MBA officials maintained close ties with high-ranking members of the military, and utilized these forces to rid its plant of individuals MBA itself viewed as subversive.

In 2004, appellants filed a complaint in the District Court for the Northern District of California against DaimlerChrysler AG ("DCAG"), MBA's parent company, requesting relief. In April 2005, DCAG filed a Motion to Dismiss for Lack of Personal Jurisdiction in California.

DCAG is a German stock company with its principal seat in Stuttgart, Germany. Mercedes Benz USA, LLC ("MBUSA") is a Delaware limited liability company with its principal place of business in New Jersey. MBUSA is a

---

[1]One appellant is a citizen of Chile, although he also resides in Argentina.

wholly-owned subsidiary of the DaimerChrysler North America Holding Corporation, a holding company, which, in turn, is a subsidiary of DCAG. MBUSA has two offices in California, and it is undisputed that MBUSA is subject to general jurisdiction in the state.

DCAG manufactures Mercedes Benz motor vehicles and related component parts. MBUSA is not involved in the design or production of the vehicles. Rather, MBUSA is responsible for the marketing and distribution of the vehicles in California, in addition to providing service and sales support. DCAG sells its vehicles, manufactured in Germany, to MBUSA in Germany, where title passes.

Between 1952 and 1957, an independent distributor named Max Hoffman was the sole distributor of Mercedes Benz vehicles in the United States. In 1958, Hoffman was replaced by an independent subsidiary of the Studebaker-Packard Corporation. In 1964, that company went out of business, and distribution was subsequently undertaken by the predecessor-in-interest to MBUSA.

According to the Vice-President of DCAG, DCAG could not distribute vehicles in California without revising its business model, employing a considerable number of individuals, making massive investments in new facilities, and incurring significant tax exposure. DCAG also presented evidence that the most profitable Toyota distributor in the United States, Southeast Toyota Distributors, is a wholly independent, non-subsidiary distributor.

The DCAG-MBUSA relationship is governed by a General Distributor Agreement ("the Agreement"). Under the Agreement, both parties agree upon objectives to be reached by MBUSA prior to each Sales Period. Either company may terminate the Agreement for good cause and with notice to the other party. In the event of termination, all amounts owed by

either party would be immediately due, and DCAG would be required to repurchase all vehicles and parts.

DCAG has no control over the product's ultimate destination within the United States. Until 2001, MBUSA independently decided against buying DCAG G-Class vehicles in California, and those automobiles were therefore sold to an independent and unrelated company.

Upon request by DCAG, MBUSA must provide all information relevant to the financial condition, management, ownership, business practices, and corporate reputation of authorized resellers, as well as copies of all relevant agreements, its comprehensive advertising and marketing plan, and its balance sheets.

MBUSA must also comply with the standards designated by DCAG as binding, although any change requires one year's notice. Marketing strategy and advertising must be consistent with applicable standards, brand representation, and DCAG directives, standards, and processes.

DCAG may reject proposed appointments of Authorized Resellers, must consent before MBUSA management positions can be combined, and must approve the replacement of key personnel. Furthermore, MBUSA must comply with DCAG instructions to modify or alter any of their agreements with Resellers. Offices, sales, and service facilities must be at approved locations and must comply with DCAG requirements. Finally, DCAG reserves the right to approve or disapprove of the type, design, and size of signage.

On November 22, 2005, the District Court issued an order tentatively granting DCAG's motion. The court found that (1) DCAG did not have continuous and systematic contacts via the contacts of MBUSA under agency jurisdiction; and (2) the exercise of jurisdiction would be unreasonable, considering (a) the extent of DCAG's purposeful interjection, (b) the bur-

den on DCAG, (c) conflicts with the sovereignty of Argentina and Germany, (d) California's interest in adjudicating the dispute, (e) the availability of alternative fora, (f) efficient judicial resolution, and (g) the need to give convenient and effective relief to the plaintiffs.[2]

The court's ruling, however, was tentative and it ordered limited jurisdictional discovery on: (1) whether an agency relationship existed between DCAG and MBUSA, and (2) the ability of the appellants to pursue their claims in Germany or Argentina. In its Supplemental Opposition to the Motion, after discovery, appellants addressed the agency relationship and alternative fora as requested. They also argued that jurisdiction should be conferred upon DCAG because of its contacts with the United States as a whole, pursuant to Fed. R. Civ. P. 4(k)(2), and requested, in the alternative, that the District Court transfer the case to Michigan if it found that it did not have personal jurisdiction over DCAG.

On February 12, 2007, the court concluded that its earlier ruling was correct and granted the motion to dismiss. In its final order, it found that (1) MBUSA was not DCAG's agent for the purpose of conferring general jurisdiction, and (2) both Germany and Argentina provided an adequate forum for appellants' claims. The court did not consider the 4(k)(2) and change of venue arguments because both exceeded the scope of its supplemental briefing order. The appellants timely appealed, asserting that the District Court erred in finding that it lacked jurisdiction over DCAG, and alleging various procedural defects in the lower court's ruling.

## JURISDICTION

The parties dispute whether there is subject matter jurisdic-

---

[2]The court also found that DCAG did not, in and of itself, have "continuous and systematic" contacts with California sufficient to confer general jurisdiction. This finding was not appealed.

tion over appellants' claim pursuant to the Alien Tort Claims Act and the Torture Victims Protection Act. 28 U.S.C. § 1350. The District Court held that it would resolve the question of personal jurisdiction first. This exercise of discretion was proper. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) ("There is no mandatory sequencing of jurisdictional issues . . . . [A] federal court has leeway to choose among threshold grounds for denying audience to a case on the merits.") (internal quotations omitted); *see also Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 588 (1999).

## STANDARD OF REVIEW

This court reviews a dismissal for lack of personal jurisdiction de novo. *Butcher's Union, Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 538 (9th Cir. 1986). The district court's decision to dismiss or transfer a case pursuant to 28 U.S.C. § 1406(a) is reviewed for abuse of discretion. *See King v. Russell*, 963 F.2d 1301, 1304 (9th Cir. 1992).

"It is the plaintiff 's burden to establish the court's personal jurisdiction over a defendant." *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001). When, as here, the district court " 'rel[ies] on affidavits and discovery materials without holding an evidentiary hearing, dismissal is appropriate only if the plaintiff has not made a prima facie showing of personal jurisdiction.' " *See Am. Tel. & Tel. Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996) (quoting *Fields v. Sedgwick Assoc. Risks, Ltd.*, 796 F.2d 299, 301 (9th Cir. 1986)). "[C]onflicts between the facts contained in the parties' affidavits must be resolved in . . . [plaintiff 's] favor.' " *Id.* (internal quotations omitted).

## DISCUSSION

"Personal jurisdiction over a nonresident defendant is tested by a two-part analysis." *Chan v. Soc'y Expeditions,*

*Inc.*, 39 F.3d 1398, 1404 (9th Cir. 1994). "First, the exercise of jurisdiction must satisfy the requirements of the applicable state long-arm statute." *Id.* "Second, the exercise of jurisdiction must comport with federal due process." *Id.* at 1404-05. "[B]ecause California's long arm statute is coextensive with the limits of due process, the court need only consider the requirements of due process." *Synopsys, Inc. v. Ricoh Co.*, 343 F. Supp. 2d 883, 886 (N.D. Cal. 2003).

Due process requires that a nonresident defendant have certain minimum contacts with the forum state so that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945). Where the claim does not arise out of a defendant's contacts with the forum, there is no specific jurisdiction. However, "[i]f the defendant's activities in the forum are substantial, continuous and systematic, general jurisdiction is available." *Unocal*, 248 F.3d at 923. "In addition to establishing the requisite contacts, the assertion of jurisdiction must be found reasonable." *In re Phenylpropanolamine Prods. Liab. Litig.*, 344 F. Supp. 2d 686, 690 (W.D. Wash. 2003).

## A.    AGENCY JURISDICTION

Appellants argue that the continuous and systematic contacts of MBUSA, a subsidiary, should be attributed to DCAG, its parent, because MBUSA was its agent for purposes of personal jurisdiction.

"The existence of a relationship between a parent company and its subsidiaries[, however,] is not sufficient to establish personal jurisdiction over the parent on the basis of the subsidiaries' minimum contacts with the forum." *Unocal*, 248 F.3d at 925. "[A] parent corporation may be directly involved in the activities of its subsidiaries without incurring liability so long as that involvement is consistent with the parent's investor status." *Id.* at 926 (internal quotations omitted).

### 1.    AGENCY DOCTRINE

**[1]** In *Unocal*, we described our agency doctrine, by which the contacts of a subsidiary may be imputed to the parent. 248 F.3d at 928-31. "To satisfy the agency test, the plaintiff must make a prima facie showing that the subsidiary represents the parent corporation by performing services 'sufficiently important to the [parent] corporation that if it did not have a representative to perform them, the [parent] . . . would undertake to perform substantially similar services.' " *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1135 (9th Cir. 2003) (quoting *Chan*, 39 F.3d at 1405). The "test permits the imputation of contacts where the subsidiary was 'either established for, or is engaged in, activities that, but for the existence of the subsidiary, the parent would have to undertake itself.' " *Id.* (internal quotations omitted).

**[2]** The *Unocal* "court distinguished an agency relationship between a parent and its subsidiary from that of a holding company and its subsidiary, explaining that in the case of a holding company the parent could simply hold *another type* of subsidiary." 248 F.3d at 929 (citing *Gallagher v. Mazda Motor of Am., Inc.*, 781 F. Supp. 1079, 1085 (E.D. Pa. 1992)) (emphasis added). If "the business of the parent is the business of investment," then the subsidiaries do not conduct business as agents. *Id.* (internal citations omitted). "Where, on the other hand, the subsidiaries are created by the parent, for tax or corporate finance purposes, there is no basis for distinguishing between the business of the parent and the business of the subsidiaries.' " *Id.* "The doctrine supports the exercise of jurisdiction when the local subsidiary performs a function that is compatible with, and assists the parent in the pursuit of, the parent's *own* business." *Sonora*, 83 Cal. App. 4th at 543.

**[3]** To that end, "[a]ppropriate parental involvement includes: monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures."

*Unocal*, 248 F.3d at 926 (internal quotations omitted). "[I]t is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability." *Id.* Similarly, consolidated reports are not dispositive. *Id.* at 929.

## 2.   THE ISSUE OF CONTROL

Although appellants later conceded that pervasive control is also necessary to confer agency jurisdiction, the parties initially disputed this issue. This court's decision in *Unocal*, read in isolation, has given rise to some confusion. The beginning of the opinion refers to the need for control. *See, e.g.*, *id.* at 926 ("An alter ego or *agency* relationship is typified by parental *control* of the subsidiary's internal affairs or daily operations.") (emphasis added). The opinion, however, did not discuss control further. *See id.* In *Modesto City Sch. v. Riso Kagaku Corp.*, the District Court for the Eastern District of California found that control was **not** required by *Unocal*. 157 F. Supp. 2d 1128, 1133 (E.D. Cal. 2001) ("Read in isolation, certain phrases suggest that such may be the case; however, read in context and in relation to other Ninth Circuit decisions, the court finds that day-to-day control is not an element of the general agency test in the Ninth Circuit."). Other district courts, citing *Modesto*, have followed suit. *See, e.g.*, *In re W. States Wholesale Natural Gas Litig.*, 605 F. Supp. 2d 1118, 1134-38 (D. Nev. 2009); *Synopsys*, 343 F. Supp. 2d at 887; *see also Phenylpropanolamine*, 344 F. Supp. 2d at 694 (recognizing the conflict between *Unocal* and *Modesto*).

**[4]** We write to clarify our law in the area of agency jurisdiction because the *Modesto* court misinterpreted *Unocal*. A determination of agency jurisdiction requires a two-step analysis. First, the parent must exert control that is so pervasive and continual that the subsidiary may be considered an agent or instrumentality of the parent, notwithstanding the maintenance of corporate formalities. Control must be over and above that to be expected as an incident of ownership. Sec-

ond, the agent-subsidiary must also be sufficiently important to the parent corporation that if it did not have a representative, the parent corporation would undertake to perform substantially similar services. *See Rutsky*, 328 F.3d at 1135.

**[5]** As an initial matter, a review of our cases reveals that control has always been relevant to an agency determination. *See Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 419 (9th Cir. 1977) ("[E]stablishment of the requisite *'agency' control* may be even easier when a parent-subsidiary relationship is involved.") (emphasis added); *Kramer Motors, Inc. v. British Leyland, Ltd.*, 628 F.2d 1175, 1177 (9th Cir. 1980) ("These facts are insufficient to make . . . [the parent] an 'alter ego' or '*agent*' . . . [because] [n]one of the . . . companies *controls* the internal affairs . . . or determines how it operates on a daily basis.") (emphasis added); *Rutsky*, 328 F.3d at 1135 ("Such activity might well be properly characterized as inconsistent with the parent corporation's investor status, and more like *control* over day-to-day activities.") (emphasis added). Thus, before *Unocal* and consistent with it, this court had already indicated that a high degree of control is necessary to confer agency jurisdiction.

**[6]** Secondly, under common law principles, control is the *sine qua non* of agency. *See* RESTATEMENT (THIRD) OF AGENCY § 1.01 cmt. c (2006) ("A relationship is not one of agency within the common-law definition unless . . . the principal has the right . . . to control the agent's acts.").

**[7]** Finally, other circuits considering the issue have held that the right to control is of consequence to agency jurisdiction, although the cases vary as to what precise role it plays. *See, e.g., Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 788 (7th Cir. 2003) (Plaintiff "has not demonstrated that . . . [defendant] exerts an unusually high degree of control."); *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998) (control as one of several factors); *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir. 1983)

(conflating agency and alter ego jurisdiction but requiring control for both).

## 3. APPLICATION TO DCAG

[8] We now turn to the facts of this case. In determining whether or not DCAG exerts control that is so pervasive and continual that MBUSA may be considered an agent of DCAG, it is necessary to turn to the terms of the Agreement. The requirements that MBUSA provide detailed information and comply with general marketing standards are consistent with the "monitoring" and "articulation of general policies" permitted under our law. *See Unocal*, 248 F.3d at 926. Furthermore, although DCAG articulates some specific policies for MBUSA, the Agreement was terminable, MBUSA goals are negotiated by both parties, and title to the cars passes in Germany. DCAG has no control over the product's ultimate destination within the United States, and the evidence shows that MBUSA had the power to independently decide against buying DCAG G-Class vehicles in California. This is not pervasive and continual control.

Even if DCAG did exert pervasive control, appellants have also failed to make a prima facie showing that DCAG would undertake to perform substantially similar services in the absence of MBUSA. It is true that the question is close. Although DCAG points to the costs of distribution and the accompanying tax exposure, "[w]here . . . subsidiaries are created by the parent[ ] for tax or corporate finance purposes, there is no basis for distinguishing between the business of the parent and the business of the subsidaries." *See Unocal*, 248 F.3d at 929. DCAG does not appear to own MBUSA solely as an investment; rather, MBUSA markets and sells cars produced by DCAG, thus "perform[ing] a function that is compatible with, and assists . . . [DCAG] in the pursuit of . . . [its] own business." *See Sonora*, 83 Cal. App. 4th at 543. The evidence that DCAG has previously used independent distributors, however, along with Toyota's successful use of

autonomous distributors, militates against a finding that without MBUSA, DCAG would personally market and distribute vehicles in California.

**[9]** Because there is insufficient control and because MBUSA does not serve as DCAG's representative, the contacts of MBUSA cannot be imputed to DCAG.

## B.    REASONABLENESS OF JURISDICTION

"In addition to establishing the requisite contacts, the assertion of jurisdiction must be found reasonable." *Phenylpropanolamine*, 344 F. Supp. 2d at 690. Because we find that DCAG did not have continuous and systematic contacts sufficient to confer general jurisdiction, we need not reach the question of reasonableness. We also need not reach DCAG's request that some of the evidence bearing on reasonableness be disregarded.

## C.    PROCEDURAL ISSUES

### 1. IMPROPER CONVERSION OF DCAG'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION INTO A MOTION TO DISMISS BASED ON FORUM NON CONVENIENS

Appellants assert that the District Court improperly converted the defendant's motion to dismiss for lack of personal jurisdiction into a de facto dismissal on forum non conveniens grounds because its final order discussed only the adequacy of alternative fora.

**[10]** Appellants mischaracterize the underlying record. Although the final order only discussed the agency relationship and the alternative fora, the District Court considered the other reasonableness factors in its earlier tentative ruling. Because "[a]n appeal from a final judgment draws in question all earlier, non-final orders and rulings which produced the

judgment," *Litchfield v. Spielberg*, 736 F.2d 1352, 1355 (9th Cir. 1984), the District Court did not convert DCAG's motion into a de facto forum non conveniens motion.

### 2. REFUSAL TO CONSIDER APPELLANTS' ARGUMENT FOR A FINDING OF PERSONAL JURISDICTION PURSUANT TO FED. R. CIV. P. 4(k)(2) OR ITS REQUEST FOR TRANSFER TO MICHIGAN

The District Court did not address either appellants' assertion that the court had jurisdiction over DCAG pursuant to Fed. R. Civ. P. 4(k)(2), or their request for transfer, because both exceeded the scope of the supplemental briefing order.

According to the Local Court Rules for the Northern District of California, "once a reply is filed, no additional memoranda, papers or letters may be filed without prior Court approval." N.D. CAL. CIV. R. 7-3(d); *see also Spacey v. Burgar*, 207 F. Supp. 2d 1037, 1053-54 (C.D. Cal. 2001) (denying plaintiff 's motion to reconsider due to newly presented evidence of 4(k)(2) jurisdiction "because . . . [plaintiff] made a deliberate choice not to include the argument in his initial opposition to Defendant's Motion").

Furthermore, if a party first raises an issue "in a motion which the district court refused to consider because it was untimely and *in contravention of local rules*," and does not appeal the district court's procedural ruling, the issue is waived. *Palmer v. IRS*, 116 F.3d 1309, 1312-13 (9th Cir. 1997) (emphasis added).

**[11]** When the District Court issued its tentative ruling in favor of DCAG, it requested supplemental briefing solely on the agency relationship and the adequacy of alternative fora. The 4(k)(2) argument and request for transfer were, therefore, in contravention of the local rules. *See* N.D. CAL. CIV. R. 7-3(d). Regardless, because appellants repeated their substantive

argument rather than address the procedural ruling in their brief, this argument is waived. *See Palmer*, 116 F.3d at 1312-13.

## *CONCLUSION*

For the foregoing reasons, we find that the District Court did not have personal jurisdiction over DCAG. We therefore AFFIRM the District Court's order.

**AFFIRMED.**

---

REINHARDT, Circuit Judge, dissenting:

The majority has formulated a stringent new test for determining whether an agency relationship exists for the purposes of establishing personal jurisdiction. Although the majority's goal of providing some clarity to our rather muddled case law on the subject is laudable, the test it imposes goes too far, requiring a much stronger relationship between parent and subsidiary than is necessary or desirable. The result is to shield foreign corporations from actions in American courts — although they have structured their affairs so as to reap vast profits from American markets — and to deprive plaintiffs, including those who allege grave human rights abuses, of access to justice. Accordingly, I dissent.

## I.   Minimum Contacts

### A.

Under our existing precedent, if one of two tests is satisfied, we may find minimum contacts to support the exercise of personal jurisdiction over a foreign parent company by virtue of its relationship to a subsidiary that has continual opera-

tions in the forum. The first test, not directly at issue here, is the "alter ego" test. It is predicated upon a showing of *control*:

> [T]he plaintiff must make out a prima facie case (1) that there is such unity of interest and ownership that the separate personalities of the two entities no longer exist and (2) that failure to disregard their separate identities would result in fraud or injustice. The first prong of this test has alternately been stated as requiring a showing that the parent controls the subsidiary to such a degree as to render the latter the mere instrumentality of the former.

*Doe v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001) (internal citations, quotation marks, and brackets omitted). The second test is the "agency" test. It, by contrast, is predicated upon a showing of the *special importance* of the services performed by the subsidiary:

> The agency test is satisfied by a showing that the subsidiary functions as the parent corporation's representative in that it performs services that are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services.

*Id.* at 928 (quoting *Chan v. Society Expeditions, Inc.*, 39 F.3d 1398, 1405 (9th Cir. 1994)) (quotation marks omitted); *see also Harris Rutsky & Co. Ins. Services, Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1135 (9th Cir. 2003).

The principal focus of the agency test for purposes of personal jurisdiction, therefore, is not "control" — much less "pervasive and continual" control, Maj. Op. at 12008-09 — but rather the relative importance of the services provided to the parent corporation. The cases that might be read to require a stronger showing of control use such language imprecisely,

describing *both* the agency and alter ego tests without differentiating between them. *See, e.g.*, *Unocal*, 248 F.3d at 926 ("An alter ego or *agency* relationship is typified by parental *control* of the subsidiary's internal affairs or daily operations.") (emphasis added); *Kramer Motors, Inc. v. British Leyland, Ltd.*, 628 F.2d 1175, 1177 (9th Cir. 1980) (per curiam) ("These facts are insufficient to make . . . [the parent] an 'alter ego' or '*agent*' . . . [because] [n]one of the . . . companies *controls* the internal affairs . . . or determines how it operates on a daily basis.") (emphasis added). The majority's "pervasive and continual" control standard compounds this confusion by conflating the alter ego and agency tests, with the result that it is difficult to conceive of a situation in which the subsidiary would be the agent of its parent and not the alter ego.

To be sure, control should play some role — albeit a secondary one — in determining whether personal jurisdiction is established. This is so because control is a traditional element of agency under common law principles.[1] Even at common law, however, agents may exercise a considerable amount of discretion in performing their functions. *See* Restatement (Third) of Agency § 2.01, cmt. d. It is not the case, as the majority holds, that "the parent must *exert* control that is . . . *pervasive and continual* . . . ." Maj. Op. at 12008-09 (emphasis added). Indeed, the principal need not *exercise* control at all in order to preserve an agency relationship; the relevant inquiry, rather, is whether the principal has the *right* to con-

---

[1]Even *Modesto*, the district court decision that most emphatically rejects a strict requirement of control under the agency test, does not suggest otherwise. *See Modesto City Schools v. Riso Kagaku Corp.*, 157 F. Supp. 2d 1128, 1134 (E. D. Cal. 2001) ("In so holding this court does not suggest that control is wholly irrelevant to the general agency test. Rather, the court finds that it is not the *sine qua non* of the general agency test."). The majority incorrectly states that *Modesto* held that "control was **not** required by *Unocal*." Maj. Op. at 12008 (emphasis in original). In fact, *Modesto* held that *day-to-day control* was not required by *Unocal* — quite a distinct proposition. *See Modesto*, F. Supp. 2d at 1133.

trol. *See, e.g.*, *In re Coupon Clearing Service, Inc.*, 113 F.3d 1091, 1099 (9th Cir. 2005) ("The right to control, rather than its exercise is sufficient to meet this standard."). As explained in the Restatement (Third) of Agency:

> A principal's right to control the agent is a constant across relationships of agency, but the content or specific meaning of the right varies. Thus, a person may be an agent although the principal lacks the right to control the full range of the agent's activities, how the agent uses time, or the agent's exercise of professional judgment. A principal's failure to exercise the right of control does not eliminate it, nor is it eliminated by physical distance between the agent and principal . . . .

§ 1.01 cmt c (2006).

The level of control required by the majority is excessive, therefore, even for purposes of considering traditional questions of liability. But we should in any event require a *less* stringent showing of control for the limited purpose of establishing personal jurisdiction, for at least two reasons. First, according to the majority "control" is but one part of a two-pronged agency test for the purposes of establishing personal jurisdiction; we must also determine that the services are "sufficiently important." *See Unocal*, 248 F.3d at 928; *Harris Rutsky*, 328 F.3d at 1135. Outside the context of personal jurisdiction, we do not require this double showing in order to establish an agency relationship: the tasks to be performed by the agent on behalf of the principal need not be of any special importance. *See, e.g.*, *Batzel v. Smith*, 333 F.3d 1018, 1036 (9th Cir. 2003); Restatement (Third) of Agency § 1.01 (2006). By compounding a strict control requirement with a requirement that the services be "sufficiently important," the majority has established a test for agency that is significantly *more* stringent for purposes of personal jurisdiction than the test for purposes of liability.

We must remember that here, we are establishing a test for agency in a specialized context. We are not asked to determine the contours of vicarious liability, or to hold DCAG financially liable for the actions of MBUSA. We are deciding one question, only: whether DCAG has sufficient "minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quotation omitted). Indeed, our tests for agency and alter ego when the issue is jurisdictional "are merely shorthand devices for defining what constitutes traditional notions of fair play and substantial justice for purposes of the due process analysis of *International Shoe* based upon the parent-subsidiary relationship." *In re Telectronics Pacing Systems, Inc.*, 953 F. Supp. 909, 919 (S.D. Ohio 1997). Fairness is not well served in such cases by a stringent test based on a narrow, overly formalistic conception of day-to-day corporate control.

In an increasingly complex and globalized economy, corporations such as DCAG reap enormous profits from the sale of their goods in the United States, achieved through the use of distributors, frequently in the form of subsidiaries. Many multinational companies organize their corporate structure and acquire subsidiaries for the sole purpose of obtaining a maximal benefit from the American market. DCAG, for instance, has earned 45% of its annual revenue from its sales in the United States. 2.4% of its total sales in 2004 were in California. Given these realities, and the continually evolving ways of doing business in an international arena, it is a mistake for the majority to formalize and rigidify our test for personal jurisdiction with an over-emphasis on control. As noted by our highly-regarded colleague from New York, Jack Weinstein, nearly three decades ago, such rigid formalism does not map well onto the realities of the business world:

> [D]ifferent control relationships inhere in different multinational structures, and we lose sight of the

economic realities if we insist on masking these distinctions behind simplistic formulae. The kind of "day-to-day control", to the extent such a nebulous concept can be made concrete, will vary depending on the kind of subsidiary involved. Thus, while "day-to-day control" might be required to attribute the activities of a relatively autonomous manufacturing subsidiary to its conglomerate parent, this by no means implies such a requirement as to a wholly-owned sales and marketing subsidiary which is the conduit for the sales of a single product in the New York market.

*Bulova Watch Co., Inc. v. K. Hattori & Co., Ltd.*, 508 F.Supp. 1322, 1343 (E.D.N.Y. 1981) (Weinstein, J.). Our inquiry should be flexible enough to allow us to determine, on the basis of corporate realities rather than formalistic legal rules, whether it is *fair* to bring a parent company into court in the United States.

Under the more flexible approach that I would employ, the degree of control that DCAG exercises over MBUSA would be more than sufficient for the purposes of establishing personal jurisdiction. The evidence adduced may, in fact, support a finding of control even under the majority's overly stringent test. The following list details, at a minimum, the ways in which DCAG has the power to control MBUSA's activities:

- MBUSA must comply with all DCAG "directives, standards and processes," in its promotion and advertising, which include directives regarding type, design, and size of the signs used by MBUSA.

- MBUSA must submit, at least three months prior to the commencement of each Sales Period, its comprehensive advertising and marketing plan for DCAG's review and approval.

- MBUSA must keep DCAG informed of all marketing, advertising, and promotional activities it implements as well as the results of such activities.

- DCAG owns 100% of the capital stock of MBUSA.

- DCAG retains full ownership of "Mercedes-Benz" trademark.

- MBUSA is required to use the DCAG financial system and maintain records and operating reports based on the standards set forth by DCAG.

- MBUSA must receive approval from DCAG before entering into an agreement with any "Authorized Reseller," and after agreement, must approve the location of "each retail sales outlet, showroom and service facility." "DCAG may, in its sole discretion, reject any such proposed appointment."

- MBUSA must obtain approval from DCAG to replace key personnel (including the CEO).

- DCAG provides the warranty terms for vehicles to consumers.

- MBUSA cannot make alterations to the cars without prior approval, other than alterations ordered by specific customers in connection with vehicles purchased by those customers.

- MBUSA can use only DCAG-supplied parts when repairing or maintaining its own vehicles.

- DCAG can compel MBUSA to engage in dealer advertising programs and parts merchandising programs.

- MBUSA must keep DCAG updated on all promotional materials it uses. MBUSA must adhere to the details of signage and marketing specifications as set out by DCAG, including the type, design, and size of MBUSA's and Authorized Resalers' signage.

- DCAG employees hold senior decision-making positions within the MBUSA Board of Directors.

- MBUSA must collect customer data and furnish periodic reports, upon request from DCAG.

- MBUSA works closely with DCAG to ensure regulatory compliance regarding manufacturing, sales, and legal requirements.

All of these provisions support the conclusion that DCAG is involved in — and has the power to exert sufficient control over — key aspects of MBUSA's operations. If the services that MBUSA provides are "sufficiently important," — and I turn to that question next — lack of more "control" than DCAG possesses here should be no bar to personal jurisdiction.

## B.

This brings me to the remainder of my disagreement with the majority opinion. The evidence that DCAG has previously used independent distributors to facilitate its car sales in the United States, along with Toyota's successful use of autonomous distributors, does not undermine the conclusion that there is an agency relationship between MBUSA and DCAG for purposes of establishing personal jurisdiction.

As an initial matter, the parties dispute whether DCAG would be able to rely successfully on the services of independent distributors to market and sell cars in the United States should it terminate its relationship with MBUSA. Although Toyota has used independent distributors successfully, previous efforts to do so by DCAG's predecessor failed, and it is entirely speculative that future efforts would succeed. DCAG's capacity to sell cars without a wholly-owned subsidiary is a disputed question of fact that should have been resolved in plaintiffs' favor. *See Am. Tel. & Tel. Co.*, 94 F.3d at 588 (in determining whether there is personal jurisdiction over the defendant, "conflicts between the facts contained in the parties' affidavits must be resolved in . . . [plaintiff 's] favor").

More important, however, under the agency test, a subsidiary acts as an agent if the parent would undertake to perform the services itself *if it had no representative at all* to perform them. *Unocal*, 248 F.3d at 928 (finding agency if the services are "sufficiently important to the foreign corporation that if it did not have *a representative* to perform them, the corporation's own officials would undertake to perform substantially similar services") (emphasis added).[2] The law does not

---

[2]Admittedly, there is a lack of clarity and consistency in the previous articulations of the "sufficient importance" test. Some language in *Unocal* appears to require that without the *particular* subsidiary's services, the parent company would undertake the agent's activities *itself*, perhaps through the use of its own personnel. *See Unocal*, 248 F.3d at 928 ("[C]ourts have permitted the imputation of contacts where the subsidiary was 'either established for, or is engaged in, activities that, but for the existence *of the subsidiary*, the parent would have to undertake itself.") (emphasis supplied) (quoting *Chan*, 29 F.3d at 1405 n.9). This language suggests that as long as the subsidiary's services could be performed equally effectively by an independent contractor, no agency relationship can exist. In a complex global economy, this standard makes little sense. Companies can outsource most necessary services to other companies to perform on their behalf; but that does not mean that the subsidiaries performing those services are not or cannot be agents of their parent companies. Accordingly, I accept the more sensible statement of the *Unocal* court set forth on the same page of its opinion and quoted in the text above.

require that the parent would undertake to perform the services if they were no longer to be performed by a subsidiary. Rather the question is whether these important services would be performed by "a representative" if the company did not perform them itself. Independent contractors may be considered representatives under certain circumstances,[3] and contracting with such independent dealers to achieve the same end — distributing cars in the United States — means, in practice, obtaining a "representative" to "undertak[e] substantially similar services." As the services that MBUSA currently performs are sufficiently important to DCAG that it would undertake to perform them through other means if MBUSA did not exist, whether through a non-subsidiary distributor (i.e., another representative) or by using its own personnel, the agency test has been met.

## C.

The parties here agree that *MBUSA's* contacts with California warrant the exercise of general jurisdiction. In other words, its "continuous corporate operations within [the] state are . . . so substantial and of such a nature as to justify suit against the defendant on causes of action arising from dealings entirely distinct from those activities." *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1169 (9th Cir. 2006) (quoting *International Shoe*, 326 U.S. at 318) (internal alterations omitted). Our inquiry, explained above, is as to the fairness of imputing those extensive contacts to DCAG, MBUSA's parent. We should ask: Are the services provided by MBUSA sufficiently important to DCAG that, if MBUSA went out of business, DCAG would undertake to continue

---

[3]An agent need not necessarily be a subsidiary; an independent corporation or individual may be an agent under certain circumstances, as well. *See, e.g.*, *Wells Fargo* at 419 ("There appears to be no reason why a completely independent, in-state corporation cannot be held to have acted as an agent for another, out-of-state corporation in performing activities giving rise to a cause of action").

selling cars in this vast market itself or alternatively sell its cars through a new representative or representatives? Of lesser importance, is DCAG entitled to control MBUSA to some degree, such that the connection necessary for the exercise of personal jurisdiction has been shown? Undoubtedly, the answer to both of these questions is yes. As Judge Weinstein aptly explained,

> To any layman it would seem absurd that our courts could not obtain jurisdiction over a billion dollar multinational which is exploiting the critical New York and American markets to keep its home production going at a huge volume and profit. This perception must have a bearing on our evaluation of fairness. The law ignores the common sense of a situation at the peril of becoming irrelevant as an institution.

*Bulova Watch Company*, 508 F. Supp. at 1327.[4] To the ordinary American, and certainly, to this judge, it would seem odd, indeed, that the manufacturer of Mercedes-Benz vehicles could not be called into federal court in the state of California. On our streets and highways, Mercedes-Benz cars are ubiquitous, and Mercedes-Benz dealerships, required to display the signage mandated by DCAG, have a highly visible presence. DCAG makes nearly half of its sales in the United States and

---

[4]*See also Newport Components, Inc. v. NEC Home Electronics (U.S.A.), Inc.*, 671 F.Supp. 1525, 1534 (C.D. Cal. 1987) ("[A]s the international economy becomes more interdependent, the formal but artificial separation between a foreign parent corporation and its domestic subsidiary becomes less compelling for purposes of determining personal jurisdiction. Moreover, with the increasing domination of the world economy by multinational corporations, it is appropriate to look to the parent company (i.e., the 'hub of the wheel') when its subsidiaries (i.e., the 'spokes of the wheel') violate substantive rights in foreign countries. The Court agrees with this trend in the law toward greater accountability by foreign corporate entities, and will accordingly look to the 'real' rather than the 'formal' relationship between NEC and its subsidiaries in deciding the jurisdiction issue." (internal citations omitted)).

a hefty number in California itself. To achieve these profits, DCAG has acquired a wholly-owned subsidiary, MBUSA, to sell its cars in the United States. Our test for personal jurisdiction should not fail to take these realities into account.

## II.    Reasonableness

Because I would hold that there is ample evidence of an agency relationship between DCAG and MBUSA, such that MBUSA's contacts with California should be imputed to DCAG, I would move on to consider a question that the majority has not reached: whether the assertion of jurisdiction is "reasonable" in this case.

Because the plaintiffs ("Bauman") have made the requisite showing of minimum contacts in the forum state, "[t]he burden . . . shifts to the defendant to present a compelling case that jurisdiction would be unreasonable." *Sinatra v. National Enquirer, Inc.*, 854 F.2d 1191, 1198 (9th Cir. 1988) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)); *see also Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1175 (9th Cir. 2006). We weigh seven factors in resolving this question:

> the extent of purposeful interjection; the burden on the defendant; the extent of conflict with sovereignty of the defendant's state; the forum state's interest in adjudicating the suit; the most efficient judicial resolution of the dispute; the convenience and effectiveness of relief for the plaintiff; and the existence of an alternative forum.

*Sinatra*, 854 F.2d at 1198-99 (citations omitted). These factors, on balance, support the exercise of personal jurisdiction here. As the majority does not address this question, I will not dwell on any factor for long; but I will touch upon each in concluding that it is both reasonable and fair to exercise personal jurisdiction over DCAG.

First, as described at length above, DCAG has purposefully and extensively interjected itself into the California markets through its agent, MBUSA, such that general jurisdiction is warranted. This factor weighs strongly in favor of "reasonableness," as a corporation that "has continuously and deliberately exploited the [California] market . . . must reasonably anticipate being haled into court there . . . ." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 (1984).

Second, the burden on the defendant, a large corporation, to litigate the case in California is not so weighty as to preclude jurisdiction — particularly since "modern advances in communications and transportation have significantly reduced the burden of litigating in another country." *Sinatra*, 854 F.2d at 1199. DCAG has litigated cases in California in the past. *See, e.g.*, *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017 (9th Cir. 2008). The burdens to produce records and witnesses in California, when the events in question took place in Argentina, would be no greater than if suit were filed in Germany. This factor, while on balance weighing in DCAG's favor, is not particularly significant.

Third, we have held that the extent of the conflict with the sovereignty of the defendant's state "is not dispositive because, if given controlling weight, it would always prevent suit against a foreign national in a United States court." *Id.* (quotation omitted). While it is true that "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field," *Asahi Metal Industry Co., Ltd. v. Superior Court of California, Solano County*, 480 U.S. 102, 115 (1987), the same consideration will always be present in claims involving the Alien Tort Statute ("ATS") and Torture Victim Prevention Act ("TVPA"). Although German courts have expressed some concern that this suit may impinge upon German sovereignty, I do not agree. DCAG has chosen to place itself at risk of litigation by engaging in extensive business in the United States through the operations of its agent. We do not violate Germany's sov-

ereignty by exercising jurisdiction to hear this suit, even though it involves its citizen corporation. This factor again weighs in DCAG's favor, but not heavily.

Fourth, although the events at issue did not take place in California and although the plaintiffs are not California residents, the forum state does have a significant interest in adjudicating the suit. California partakes in "the shared interest of the several States in furthering fundamental substantive social policies . . . . " *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980). Here, as the claims are predicated upon the ATS and TVPA, that policy is providing a forum for redress of violations of international law by aliens outside our borders who have enough connections with the United States to be brought to trial on our shores — "a small but important step in the fulfillment of the ageless dream to free all people from brutal violence." *Filartiga v. Pena-Irala*, 630 F.2d 876, 890 (2d Cir. 1980). American federal courts — be they in California or any other state — have a strong interest in adjudicating and redressing international human rights abuses. *See, e.g.*, *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 106 (2d Cir. 2000) (holding, in the context of *forum non conveniens*, that the TVPA "has . . . communicated a policy that such suits should not be facilely dismissed on the assumption that the ostensibly foreign controversy is not our business."). In light of that important interest, this factor weighs in favor of the reasonableness of exercising personal jurisdiction.

The fifth, sixth, and seventh factors are, in this case, all influenced by whether the plaintiffs would be able to litigate this suit in Germany or Argentina at all. Bauman contends that Germany does not recognize human rights suits against corporate defendants and will not allow equitable tolling. Argentinian courts, Bauman asserts, provide no means of redress against corporations that collaborated with Argentine security forces in carrying out the Dirty War, and would bar this suit on account of the statute of limitations. Most important for our purposes is whether Argentina would be an ade-

quate forum, as Argentina — where the events at issue in this lawsuit took place — would be, all other factors being equal, the most natural location in which to litigate the case.

Bauman's arguments that Argentina would not be a fully adequate forum — if it is a forum at all — are persuasive. Most important, a recent Supreme Court case in Argentina has concluded that human rights cases arising out of the Dirty War are subject to a two-year statute of limitations. *See Larrabeiti Yanez, Anatole Alejandro vs. National Government*, L. 795. XLI. (ROR) L. 632. XLI. APPEAL. This suit would, for that reason, be barred — which makes Argentina unavailable as an alternate forum. *See Miracle v. N.Y.P. Holdings, Inc.*, 87 F. Supp. 2d 1060, 1071 (D. Haw. 2000). Even if it were possible to bring suit in Argentina, however, which appears unlikely in light of this precedent, I cannot say that either "efficient judicial resolution of the dispute" or the "convenience and effectiveness of relief for the plaintiff" would likely be achieved. The Department of State has noted "credible allegations of efforts by members of security forces and others to intimidate the judiciary and witnesses." U.S. Dep't of State, Argentina, Country Reports on Human Rights Practices — 2002, at 8 (Mar. 31, 2003). According to plaintiffs, they have already suffered from intimidation for speaking out against Mercedes-Benz Argentina and the security forces, and it is reasonable to conclude that they might continue to be so intimidated if they were to pursue this litigation in Argentina. Although it is clear that production of witnesses and documentary evidence would be easier in Argentina than in the United States, these barriers to effective relief for the plaintiffs are formidable.

As to Germany, there is conflicting expert testimony whether equitable tolling, or an equivalent within the German legal system, would allow the suit to move forward. The answer is not clear; indeed, the district court concluded that "it appears that plaintiffs' claims, which are based on events that occurred in 1976 and 1977, would not *necessarily* be

time-barred." *Bauman v. Daimlerchrysler AG*, No. C-04-00194 RMW, 2007 WL 486389, at *4 (N.D. Cal. 2007) (emphasis added) (citations omitted). I cannot, on this unsteady legal footing, say that Germany is an adequate forum such that personal jurisdiction elsewhere should be defeated.

Even if Argentina and Germany were, as DCAG argues, both adequate fora for redressing any alleged wrongs, the availability of an alternative forum is not the single deciding factor in the personal jurisdiction analysis. We are not here considering exhaustion or *forum non conveniens*. Rather, the question of an alternate forum is one factor among many that we consider in deciding whether it is *reasonable and fair* to bring DCAG, a foreign corporation with a general agent operating continually throughout the state of California, before a court in this forum.

In light of DCAG's pervasive contacts with the forum state through its agent MBUSA, as well as the interest of California and the federal courts in adjudicating important questions of human rights, and our substantial doubt as to the adequacy of either Germany or Argentina as an alternative forum, I would hold that on this record it is entirely reasonable and consistent with due process to exercise in personam jurisdiction over DCAG.

## III.

I would not have dismissed Bauman's claims for want of personal jurisdiction over DCAG. The majority's overly stringent test for agency in this context erroneously allows foreign corporations that benefit tremendously from American markets to evade judicial process through creative corporate structuring. It denies the plaintiffs, out of hand, a judicial forum and the opportunity to seek redress of grievous wrongs. There is a vast disconnect between the majority's decision today and the foundational principles of fair play and due pro-

cess that underlie our personal jurisdiction doctrine. For these reasons, I dissent.